J. ALEXANDRA RHIM (SBN 180636)
**LEVINSON ARSHONSKY & KOMSKY, LLP**
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Telephone: (818) 382-3434
Facsimile: (818) 382-3433
E-Mail: arhim@laklawyers.com
*Admitted Pro Hac Vice*

Attorneys for Celtic Capital Corporation

**UNITED STATES BANKRUPTCY COURT**

**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>BUFFALO NEWSPRESS, INC., dba BNP EMPOWERED PRINT,<br><br>Debtor. | Case No: 25-10125-CLB<br><br>Chapter 7<br><br>Adv. Case No.: [____________] |
| CELTIC CAPITAL CORPORATION, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>LEE ENTERPRISES, INCORPORATED, a Delaware corporation,<br><br>Defendant. | **COMPLAINT FOR:**<br>**(1) Breach of Contract**<br>**(2) Open Book Account**<br>**(3) Account Stated**<br>(4) **Fair Valuation** |

Plaintiff Celtic Capital Corporation (the "**Celtic**" or "**Plaintiff**"), by and through its undersigned counsel, bring this action against Defendant Lee Enterprises, Incorporated ("**Lee**" or ("**Account Debtor**") as follows:

**SUMMARY OF CLAIMS**

1. Plaintiff is, and at all times mentioned herein was, duly authorized to conduct business in the State of New York.

LEVINSON ARSHONSKY & KOMSKY, LLP

LEVINSON ARSHONSKY & KOMSKY, LLP

2. Lee is a Delaware corporation.

3. Plaintiff and Account Debtor are collectively referred to herein as the "**Parties**."

4. Plaintiff seeks to recover at least $165,627.43 owed by Account Debtor to Buffalo Newspress, Inc. ("**Borrower**") for services and/or goods provided by Borrower. Plaintiff was the secured lender to Borrower and was granted a first-priority security interest in all of Borrower's personal property assets, including accounts receivable and proceeds thereon. Pursuant to the loan documents between Plaintiff and Account Debtor, a financing order issued by this Bankruptcy Court, and California Commercial Code § 9406, 9607 and related provisions, the amounts owed by Account Debtor are owed and payable to Plaintiff.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(c)(1) and 1334 in that this proceeding arises in and is related to the chapter 7 bankruptcy case pending in the United States Bankruptcy Court of the Western District of New York ("**Bankruptcy Court**"), entitled In re Buffalo Newspress, Inc., dba BNP Empowered Print Case No. 2:25-bk-10125-CLB ("**Bankruptcy Case**").

6. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding arises under title 11 or arises under or relates to a case under title 11, which is pending in this District.

7. Account Debtor is registered with the New York Secretary of State, does business in New York, and thus has agreed to be bound by the laws of the State of New York in connection with the matters alleged herein and, therefore, this Court has jurisdiction over Account Debtor.

**FACTS COMMON TO ALL CLAIMS**

A. **Prepetition and Postpetition Loan Facility**.

8. On or about June 30, 2023, Lender made revolving loans to Borrower pursuant to a Loan and Security Agreement dated June 30, 2023, as amended from time to time (including by virtue of the DIP Loan Agreement (defined below) (the "Loan Agreement").

9. Pursuant to the Loan Agreement, Borrower granted Lender a security interest in substantially all of its assets, including but not limited to accounts receivable and proceeds

(collectively, the "**Collateral**") to secure the obligations due under the Loan Agreement. Lender perfected its security interest by duly filing a UCC-1 financing statement (the "**Financing Statement**") with the California Secretary of State. A true and correct copy of the Financing Statement is attached hereto as Exhibit 1 and incorporated herein by this reference.

10. Lender provided a facility where loan advances were made based on a borrowing base formula determined by percentages of eligible accounts receivable and eligible inventory. Lender made loan advances based on a borrowing base and other eligibility criteria as referred to above. Borrower's account debtors, including Account Debtor, were required to remit payments on accounts receivable into a certain collection account to repay the advances made against the accounts receivable.

11. On February 5, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition commencing its chapter 11 case under Title 11 of the United States Code Bankruptcy Court. After the Petition Date, the Debtor required financing to have liquidity to operate its business and attempt to reorganize.

12. The Debtor applied for and was authorized to obtain postpetition financing from Lender ("**DIP Financing**") pursuant to the Amended and Restated Loan and Security Agreement, dated May 28, 2025 (the "**DIP Loan Agreement"**) as authorized by the Final Order (A) Authorizing the Debtor to (I) Obtain Postpetition Financing, (II) Granting Liens and Provide Superpriority Administrative Expense Status, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modify the Automatic Stay, and (VI) Grant Related Relief (the "**Final Order"**) (Docket No. 147) entered on May 28, 2025. [Docket No. 147.] A true and correct copy of the Final Order (together with the DIP Loan Agreement appended thereto) is attached hereto as Exhibit 2.

13. Under the DIP Facility, Borrower received loan advances from Lender and Borrower's customers were required to remit payment to a designated bank account, which was swept daily with funds remitted to Lender. As a result of this arrangement, all account collections were remitted to Lender and not Borrower. Account Debtor followed this procedure up until recently when it has refused to pay amounts owed.

LEVINSON ARSHONSKY & KOMSKY, LLP

14. The Final Order at Section 2(e) authorizes Lender to receive the account proceeds and other Cash Collateral and apply such amounts "first to Prepetition Obligations until the Prepetition Obligations are paid and satisfied in full, and then to the DIP Obligations."

15. Pursuant to the Final Order, Lender was granted a "first priority security interest and lien" on all Collateral to secure the DIP Obligations and the Prepetition Obligations; and was granted a senior security interest and lien subject only to existing senior permitted prepetition liens. Pursuant to the Final Order, Lender was also conferred certain other DIP lender protections including a super-priority administrative priority claim senior to all other administrative expense claims, unsecured claims and all other claims

16. The Final Order also provides that it shall survive in the case, any successor case, converted case or if the case were dismissed.

17. Pursuant to an Order (1) Approving Stipulation re Relief from Automatic Stay; and (2) Granting Relief from the Automatic Stay entered on August 11, 2026, the automatic stay was lifted to permit Lender to exercise its rights and remedies including the right to collect and receive proceeds on accounts receivable (the "<u>RFS Order</u>"). [Docket No. 287.] A true and correct copy of the RFS Order is attached hereto as <u>Exhibit 3</u>.

18. At issue are the unpaid amounts owed by Account Debtor under accounts receivable (the "**Accounts**") for services and/or goods provided by Borrower. The Accounts are evidenced by, among other things, invoices issued by Borrower (collectively, the "**Invoices**"). The Loan Obligations owed by Borrower exceed the amounts owed under the Invoices. A true and correct copy of a schedule evidencing the unpaid Accounts is attached hereto as <u>Exhibit 4</u>.

19. The Accounts were generated under the terms of the DIP Loan Agreement and Final Order with Lender as the holder of rights in the Accounts. Therefore, Account Debtor is obligated to pay the amounts owed under the Accounts to Lender without further delay.

20. Pursuant to Section 5.1 of the Loan Agreement, Borrower assigned the Accounts to Lender and authorized Lender to directly collect them and notify the Account Debtor to make payments directly to Lender. Pursuant to California Commercial Code ("**CCC**") § 9607(a)(1), Lender provided notification to Account Debtor regarding the assignment of the Accounts and instructed

LEVINSON ARSHONSKY & KOMSKY, LLP

Account Debtor to make payment directly to Lender (the "**Notification**"). The Account Debtor received the Notification as confirmed in writing on September 15, 2026. A true and correct copy of the Notification and confirmation from Defendant are attached hereto collectively as Exhibit 5.

21. Pursuant to the Loan Documents and CCC § 9607, the Bank is entitled to enforce and recover the obligations due under the Invoices by Account Debtor to Borrower.

22. The aggregate amount of at least $165,627.43 plus additional amounts remain unpaid and owing on the Accounts by Account Debtor to Lender. Lender is also entitled to recover attorneys' fees and costs pursuant to CCC § 9607(d).

23. Following issuance of the Notification, Lender made numerous additional attempts to demand payment from Account Debtor. Account Debtor possesses no defense to justify its refusal to make payment.

**FIRST CAUSE OF ACTION**

**(Breach of Written Agreement Enforceable by Secured Creditor Under CCC § 9607(a) – as to all Defendants)**

24. Plaintiff repeats, re-alleges, and incorporates herein all allegations set forth in paragraphs 1 through 23, inclusive, as though set forth in full herein.

25. The Invoices giving rise to the Accounts constitute valid and binding agreements between Borrower and Account Debtor. In turn, the Notification constitutes a valid and binding agreement between Account Debtor and Plaintiff.

26. Plaintiff is informed and believes and on that basis alleges that Borrower performed all of its required obligations giving rise to the Accounts, unless excused or prevented by the conduct of Account Debtor.

27. As alleged above, Account Debtor has breached the Invoices by failing and refusing to make payment to Lender for amounts due thereunder in the aggregate amount of at least $165,627.43 plus additional amounts including legal fees and costs.

**SECOND CAUSE OF ACTION**

**(Open Book Account – Against All Defendants)**

28. Plaintiff repeats, re-alleges, and incorporates herein all allegations set forth in

LEVINSON ARSHONSKY & KOMSKY, LLP

paragraphs 1 through 27, inclusive, as though set forth in full herein.

29. Within the last four years, an account was stated in writing by and between Borrower and Account Debtor, and each of them, wherein and whereby it was agreed that said Account Debtor was indebted to Plaintiff in the amount of at least $165,627.43. Account Debtor has never timely, effectively or substantively disputed its liability for the account stated.

30. Plaintiff is entitled to enforce and recover as an open book account based on Plaintiff's rights under the DIP Loan Agreement.

31. There is now due, owing and unpaid from Account Debtor to Lender the amount of not less than at least $165,627.43, together with interest thereafter at the rate of ten percent (10%) per annum.

**THIRD CAUSE OF ACTION**

**(Account Stated – Against All Defendants)**

32. Plaintiff repeats, re-alleges, and incorporates herein all allegations set forth in paragraph 1 through 31, inclusive, as though set forth in full herein.

33. Within the last four years, an account was stated in writing by and between Borrower and Account Debtor, and each of them, wherein and whereby it was agreed that said Account Debtor was indebted to Plaintiff in the amount of at least $165,627.43. Account Debtor has never timely, effectively or substantively disputed its liability for the account stated.

34. Plaintiff is entitled to enforce and recover as an account stated based on Plaintiff's rights under the DIP Loan Agreement.

35. There is now due, owing and unpaid from Account Debtor to Lender the amount of not less than at least $165,627.43, together with interest thereafter at the rate of ten percent (10%) per annum.

**FOURTH CAUSE OF ACTION**

**(Fair Valuation – Against All Defendants)**

36. Plaintiff repeats, re-alleges, and incorporates herein all allegations set forth in paragraph 1 through 35, inclusive, as though set forth in full herein.

37. Account Debtor received the benefit of Lender's capital as set forth above based on the

provision of services and goods by Borrower.

38. In furnishing said capital as aforesaid, Plaintiff was not acting as a volunteer, and said defendant has accepted the benefits of that which Plaintiff has furnished without paying therefor.

39. Account Debtor has therefore been unjustly enriched by the continuing use of capital provided by Plaintiff and it would be inequitable for Account Debtor to be allowed to retain the benefits of Plaintiff's capital without being ordered to pay the sum of amount of not less than at least $165,627.43, together with interest thereafter at the rate of ten percent (10%) per annum.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Account Debtor as follows:

**AS TO THE FIRST, SECOND, THIRD AND FOURTH CAUSES OF ACTION**

1. For the aggregate amount of not less than $165,627.43;

2. For interest thereon at the legal rate of 10% per annum; and

3. For recovery of reasonable attorney's fees and costs of collection and enforcement including but not limited to attorneys' fees and costs as permitted by CCC § 9607(d) or such other applicable law.

**AS TO ALL CAUSES OF ACTION**

1. For costs of suit incurred herein.

2. For such other and further relief as the Court may deem just and proper and the circumstances may require.

Dated: September 25, 2026

**LEVINSON ARSHONSKY & KOMSKY, LLP**

By:______________________________
J. ALEXANDRA RHIM
Attorneys for Plaintiff Celtic Capital Corporation

# EXHIBIT “1”

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

207766

2023 MAY -4 PM 4:30

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

UNI-37

First American Title Insurance Company
UCC Division
5 First American Way
Santa Ana, CA 92707

DRAWDOWN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME<br>Buffalo Newspress Inc. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS<br>200 Broadway | CITY<br>Buffalo | STATE<br>NY | POSTAL CODE<br>14204 | COUNTRY<br>USA |
| 1d. SEE INSTRUCTIONS \| ADD'L INFO RE ORGANIZATION DEBTOR \| 1e. TYPE OF ORGANIZATION<br>Corporation | 1f. JURISDICTION OF ORGANIZATION<br>New York | 1g. ORGANIZATIONAL ID #, if any | | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS \| ADD'L INFO RE ORGANIZATION DEBTOR \| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME<br>CELTIC CAPITAL CORPORATION | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS<br>23622 CALABASAS RD., SUITE 323 | CITY<br>CALABASAS | STATE<br>CA | POSTAL CODE<br>91302 | COUNTRY<br>USA |

4. This FINANCING STATEMENT covers the following collateral:

**ALL ASSETS**

**Pursuant to Debtor's agreements with Secured Party, Debtor is prohibited from selling, disposing of, or granting liens on, any of its assets without Secured Party's consent.**

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

NY - DOS

Buffalo 48754

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)



FILING NUMBER: 202305040154495

# EXHIBIT “2”

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

---

In Re

BUFFALO NEWSPRESS INC. d/b/a
BNP EMPOWERED PRINT

Debtor

Case No. 25-10125-CLB

Chapter 11

---

**FINAL ORDER (A) AUTHORIZING THE DEBTOR TO (I) OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY EXPENSE STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) GRANTING RELATED RELIEF**

Upon the Debtor's Motion for Entry of Interim and Final Orders **(A)** Authorizing the Debtor to (I) Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Expense Status, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief and **(B)** Scheduling a Final Hearing (the "Motion") of Buffalo Newspress Inc. d/b/a BNP Empowered Print the debtor and debtor in possession in the above-captioned Chapter 11 case (the "Case"), requesting entry of this final order (this "Final Order" or "Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506(c) and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of Bankruptcy Practice and Procedure (the "Local Rules") of the United States Bankruptcy Court for the Western District of New York (the "Court") seeking, among other relief:

1. the authorization for the Debtor to incur senior secured postpetition financing ("DIP Financing") on a superpriority basis consisting of a senior secured superpriority credit facility in (the "DIP Facility") consisting of a postpetition multi-draw loan in an amount up to $2.5 million based on a borrowing base formula and subject to the terms and conditions of this Final Order and that certain Loan and Security Agreement, dated as of June 30, 2023, as amended from time to time including the Second Modification to Loan and Security Agreement and Assumption Agreement [Debtor in Possession] dated on or about April 16, 2025 (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, collectively the "DIP Agreement"),[1] by and among the Borrower and Celtic Capital Corporation ("DIP Lender" or "Lender"),[2] substantially in the form of **Exhibit A**, attached hereto, (**Exhibit B** is a summary chart summarizing the material terms of the DIP Facility);

2. authorizing the Debtor to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement, the "DIP Documents" or "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

3. granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected security interests in and liens on all of the Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be on the terms and subject to the relative priorities set forth in the DIP Documents and this Final Order;

4. granting to the DIP Lender on account of the DIP Facility and all DIP Obligations (as defined herein) allowed superpriority administrative expense claim status in this Case and any Successor Case (as defined herein) subject to the terms set forth in this Final Order;

5. authorizing the Debtor to use the Prepetition Collateral (as defined herein) as provided for herein, including Cash Collateral under the prepetition loan documents, and providing adequate protection to the DIP Lender;

6. vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order;

---

[1] Capitalized terms used but not otherwise defined in this Final Order shall have the respective meanings ascribed to such terms in the DIP Agreement.

[2] The term "DIP Lender" shall also include Celtic in its capacity as prepetition lender.

7. waiving any applicable stay with respect to effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

8. granting the Debtor such other and further relief as is just and proper.

Having considered the Motion, the DIP Documents, the *Declaration Thomas J. Majerski of* (the "Majerski Declaration"), live testimony of Carl A. Rosati, III (adduced at the final hearing) (the "Rosati Testimony", and the evidence submitted and argument made at the interim hearing held on March 18, 2025 (the "Interim Hearing") and the final hearing held on April 14, 2025 (the "Final Hearing"; and upon the *United States Trustee's Limited Objection to Debtor's Motion to (A) Authorize the Debtor to (i) Obtain Postpetition Financing, (ii) Use Cash Collateral, (iii) Grant Liens and Provide Superpriority Administrative Expense Status, (iv) Grant Adequate Protection, (v) Modify the Automatic Stay, (vi) Grant Related Relief and (B) Schedule Interim and Final Hearings* filed March 20, 2025 and upon the *United States Trustee's Further Objection to Debtor's Motion to (A) Authorize the Debtor to (i) Obtain Postpetition Financing, (ii) Use Cash Collateral, (iii) Grant Liens and Provide Superpriority Administrative Expense Status, (iv) Grant Adequate Protection, (v) Modify the Automatic Stay, (vi) Grant Related Relief and (B) Schedule Interim and Final* filed April 10, 2025; and notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and Local Rule 9013-1; and the Final Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that the Debtor's entry into the DIP Agreement is an exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1. **Motion Granted**. The Motion is granted as set forth herein, the DIP Facility as ~~set~~ (CLB) provided in this Final Order is authorized and approved, and the use of Cash Collateral as provided for herein on a final basis is authorized, in each case subject to the terms and conditions set forth

in the DIP Documents and this Final Order. All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits in their entirety.

**2. DIP Loan Documents and DIP Protections.**

a. DIP Loan Documents. The Debtor is expressly and immediately authorized to execute the DIP Loan Documents and to execute, deliver and perform under all other instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtor under the DIP Loan Documents and the creation and perfection of the DIP Lien described in, and provided for by, this Final Order and the other DIP Loan Documents.

b. DIP Obligations. The term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing or arising under the DIP Loan Documents (including, without limitation, all "DIP Obligations," and "Postpetition Obligations" (as defined in the DIP Agreement)) and shall include, without limitation, the principal of, interest on and fees, costs, expenses and other charges owing in respect of, such amounts (including any reasonable attorneys' accountants', financial advisors' and other fees, costs and expenses), and any obligations in respect of indemnity and reimbursement claims, whether contingent or otherwise (and collectively with the Prepetition Obligations, the "Obligations"). The DIP Loan Documents shall constitute and evidence valid and binding DIP Obligations of the Debtor. The term "Prepetition Obligations" shall mean the Debtor's obligations under the prepetition loan documents.

c. Authorization to Incur DIP Obligations. The Debtor is hereby authorized to incur indebtedness to the DIP Lender and to borrow under the DIP Facility in an aggregate outstanding principal amount not to exceed the advance limits set forth in the DIP Agreement and the other DIP Loan Documents.

d. Use of DIP Facility Proceeds. The Debtor is authorized to use borrowings under the DIP Facility in accordance with the DIP Agreement.

e. Application of Payments. The DIP Lender shall apply any and all proceeds of the Collateral, including Cash Collateral, or any other payments or consideration received by Lender in accordance with the DIP Loan Documents, which includes the application of Collateral first to Prepetition Obligations until the Prepetition Obligations are paid and satisfied in full, and then to the DIP Obligations.

**3. DIP Collateral and Priority Claim.**

a. DIP Lien. The DIP Lender is granted, as security for the DIP Obligations incurred, an encumbrance, lien and security interest pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, on all property of the Debtor and its estate (the "DIP Lien"), now existing or hereinafter acquired, including all Cash Collateral (but **excluding** the Avoidance Actions defined in paragraph 4 herein and **excluding** Debtor's real property located at 230 Broadway Street, Buffalo, New York (the "Real Estate")) (all of the foregoing collateral, excluding the Real Estate, shall be referred to collectively as, the "Collateral"). Further, pursuant to section 364(d)(1) of the Bankruptcy Code, Lender shall be granted a first priority security interest and lien upon any Collateral which is subject to the prepetition security interest and lien granted in favor of the DIP Lender.

b. Prepetition Lien Securing DIP Obligations. Subject to entry of this Final Order providing such relief, in addition to the DIP Lien, DIP Lender's prepetition lien that secures the Prepetition Obligations (the "Prepetition Lien") shall encumber the Collateral to secure the DIP Obligations and the Prepetition Obligations.

c. Replacement Lien. In addition to the DIP Lien, DIP Lender is granted a lien on all of the Collateral as a replacement lien pursuant to section 361 of the Bankruptcy Code to

provide adequate protection of Lender's interest in the Collateral to the extent of any diminution in value of the Collateral resulting or arising from the use of Cash Collateral, the DIP Financing, or the imposition of the automatic stay (the "Replacement Lien," and collectively with the DIP Lien and the Prepetition Lien to the extent it secures the DIP Obligations, the "Postpetition Liens"). In addition, the Other Secured Parties are granted a replacement lien to the same extent, in the same priority, and with respect to the same assets, that serve as collateral for such Other Secured Party's prepetition indebtedness (and as consistent with prepetition Intercreditor Agreements) pursuant to section 361 of the Bankruptcy Code to provide adequate protection of such Other Secured Party's interest in its collateral to the extent of any diminution in value of its collateral resulting or arising from the use of Cash Collateral, the DIP Financing, or the imposition of the automatic stay (the "Other Party Replacement Liens"); entry of this Final Order shall be sufficient and conclusive evidence of the attachment, validity, perfection and priority of the Other Party Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, or the taking of any other action to validate or perfect the replacement lien; entry of this Final Order shall not be deemed an admission by any Other Secured Party that it is adequately protected by the terms of this Final Order; the rights of the Other Secured Parties are expressly reserved, and entry of this Final Order shall be without prejudice to, and does not constitute a waiver of (i) an Other Secured Party's rights under any of its respective loan documents, (ii) an Other Secured Party's rights to seek any other supplemental relief with respect to the Debtor's use of cash collateral to the extent permitted by prepetition Intercreditor Agreements, or (iii) an Other Secured Party's rights under the Bankruptcy Code or applicable non-bankruptcy law.

d. Postpetition Lien Priority. Notwithstanding anything to the contrary contained in this Final Order or the other DIP Loan Documents, the Postpetition Liens shall in each and every instance be a first priority and senior Lien that (i) is subject and subordinate only to any Permitted Liens[3] that have senior priority status as of the petition date (the "Petition Date") pursuant to the Intercreditor Agreements or otherwise (the "Permitted Prepetition Liens"),[4] and (ii) other than the Permitted Prepetition Liens, is otherwise senior to all prepetition and postpetition Liens of any other person or entity pursuant to section 364(c)(3) and (d) of the Bankruptcy Code.

e. Automatic Postpetition Lien Perfection. The Postpetition Liens shall, immediately and without any further action, be valid, binding, fully perfected, continuing, enforceable and non-avoidable upon the entry of this Final Order by the Court. This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the Postpetition Liens without the necessity of (a) filing or recording any financing statement, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the Postpetition Liens or to entitle the Postpetition Liens to the priorities granted herein.

4. **Super-Priority Administrative Claim Status.** In addition to the DIP Lien granted herein, except as otherwise provided herein, effective immediately upon entry of this Final Order, all of the DIP Obligations shall constitute allowed super-priority administrative claims pursuant to section 364(c)(l) of the Bankruptcy Code, which shall have priority senior to all other

[3] The term "Permitted Liens" has the meaning set out in Section 9 of the Prepetition Loan Agreement to mean the following: (i) liens in favor of Lender; (ii) liens in favor of Leaf Capital Funding, LLC; (iii) liens in favor of U. S. Bank Equipment Finance; (iv) liens in favor of Xerox Financial Services; and (v) any purchase-money lien on new equipment acquired by Debtor as of the Petition Date.

[4] S&T Bank and Change Capital Holdings I, LLC (collectively, the "Other Secured Parties") assert that they are holders of Permitted Liens and Permitted Prepetition Liens.

administrative expense claims, adequate protection and other diminution claims, unsecured claims and all other claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503 (including 503(b)(9)), 506, 507, 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code or otherwise (the "DIP Super-Priority Claims"). The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtor, and shall be payable from and have recourse to the Collateral and all proceeds thereof (but not including the Debtor's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law, and all proceeds of the foregoing (the "Avoidance Actions")). No costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, 331 and 503 of the Bankruptcy Code, or otherwise, that have been or may be incurred in this Case or in any Successor Case, and no administrative priority claims or other priority claims are, or will be, senior to, prior to or *pari passu* with, the DIP Lien or the DIP Super-Priority Claims, or with any other claims of the DIP Lender and its affiliates arising under the DIP Loan Documents. For the sake of clarity, neither the DIP Lender's Prepetition Liens nor Postpetition Liens extend to Avoidance Actions or the proceeds of Avoidance Actions, and the DIP Lender's superpriority administrative claim under 11 U.S.C. § 364(c)(1) does not extend to or cover Avoidance Actions or proceeds of Avoidance Actions.

5. **Section 507(b) Priority.** Subject to entry of a Final Order, in addition to, and without limiting the DIP Lien and the DIP Super-Priority Claims, the Lender shall be entitled to seek and assert a priority unsecured claim pursuant to section 507(b) to the extent of any diminution in value of the Collateral (the "507(b) Claim," and collectively with the "DIP Super-Priority Claims, the "Super-Priority Claims").

6. **Preservation of Trustee's Rights**

a. 506(c)/552(b)/Marshaling/Avoidance Actions. Nothing herein shall limit the rights of a chapter 7 trustee or a chapter 11 trustee under 11 U.S.C. §§ 506(c) or 552(b), or to pursue or commence any Avoidance Actions. Further, nothing herein shall limit a chapter 7 or chapter 11 trustee's right to move the Court for an order directing the DIP Lender to marshal its Collateral to the extent permissible under applicable law.

b. No Waiver of Defenses. Nothing herein shall limit any defense any party, including the DIP Lender, has to relief requested by a trustee under 11 U.S.C. §§ 506(c) or 552(b), for marshaling, or to any Avoidance Actions.

7. **Enforceability**. This Final Order shall take effect and be fully enforceable effective immediately upon its entry. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule or Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

8. **Survival of Final Order.** All provisions of this Final Order shall survive in this Case and any Successor Case, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in the Case, converting the Case to a case under chapter 7, dismissing the Case, withdrawal of the reference as to the Case or any Successor Case or providing for abstention from handling or retaining of jurisdiction of the Case in this Court, or by any other act or omission.

9. **<u>Retention of Jurisdiction</u>.** The Court has and will retain jurisdiction to enforce the terms of any and all matters arising from or related to the DIP Facility, and/or this Final Order.

Dated: May 28, 2025

CARL L. BUCKI
UNITED STATES BANKRUPTCY JUDGE

Doc #1238555.14

FILED
MAY 28 2025
BANKRUPTCY COURT
BUFFALO, NY

# EXHIBIT A

# [AMENDED & RESTATED] LOAN AND SECURITY AGREEMENT (AR / INVENTORY / TERM)

THIS [AMENDED & RESTATED] LOAN AND SECURITY AGREEMENT is entered into as of May __, 2025 by and between BUFFALO NEWSPRESS INC., a New York corporation ("Borrower"), and CELTIC CAPITAL CORPORATION, a California corporation ("Lender").

**Recitals**

A. Borrower and Lender are party to a Loan and Security Agreement dated as of June 30, 2023, as amended by the First Amendment to Loan and Security Agreement dated July 19, 2023, (said Loan and Security Agreement, as so amended, herein called the "Prior Agreement").

B. Borrower and Lender wish to amend and restate the Prior Agreement in order to, among other things, provide for debtor-in-possession financing (the "DIP Financing") to Borrower. Accordingly, the parties hereby agree to amend and restate the Prior Agreement on the terms and conditions set forth herein.

1. **Rules of Construction; Definitions.** Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with generally accepted accounting principles and practices consistently applied. All references herein to the singular or plural shall also mean the plural or singular, respectively. Words importing any gender include the other genders. References to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to. References to "writing" include printing, typing, lithography and other means of reproducing words in a tangible, visible form. The words "including," "includes" and "include" are deemed to be followed by the words "without limitation." References to articles, sections (or subdivisions of sections), recitals, exhibits, annexes and schedules are to those of this Agreement unless otherwise specified. References to agreements and other contractual instruments are deemed to include all amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. References to Persons include their respective permitted successors and assigns. All terms used herein that are defined in the California Uniform Commercial Code shall have the meanings ascribed thereto therein unless otherwise defined in this Agreement. As used herein, the following terms shall have the following meanings:

1.1 **"Account Debtor"** - any obligor to Borrower on an account, chattel paper, instrument or general intangible, or otherwise, including any customer of Borrower that makes payment to Borrower before, or simultaneously with, Borrower's delivery of goods or services to such customer.

1.2 **"Administrative Fee"** - collectively, the A/R Administrative Fee, the Inventory Administrative Fee and the Term Loan Administrative Fee.

1.3 **"Advances"** – A/R Advances and/or Inventory Advances, as applicable.

1.3.1 "Adverse Action" - (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (i) challenging or contesting the validity, priority, amount or enforceability of the Obligations, (ii) challenging or contesting the legality, validity, priority or enforceability, or seeking to invalidate, set aside, avoid or subordinate any lien or interest in favor of Prepetition Lender or Lender in the Collateral, or (iii) seeking to prevent, hinder or delay the assertion or enforcement by Prepetition Lender or Lender of any right, remedy, claim, benefit, or privilege of, or lien or interest in the Collateral, (b) a request to use cash collateral without Lender's consent, except as provided herein, (c) any negotiation, solicitation or attempt to obtain postpetition loans or other financial accommodations (other than indebtedness that would be used to pay all Obligations in full or otherwise permitted hereunder)


Case 1-26-01021-CLB, Doc 1, Filed 09/25/26, Entered 09/25/26 14:36:54, Description: Main Document , Page 22 of 72

pursuant to Section 364(c) or (d) other than from Lender without Lender's consent; *provided, however,* this prohibition does not apply to postpetition loans or other financial accommodations pursuant to Section 364(c) or (d) secured solely by assets not already encumbered by Lender's interests, not having priority over Lender's other rights, interests and claims, and not being conferred any rights more advantageous than those granted to Lender, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Prepetition Lender or Lender, or any of its respective officers, directors, employees, agents, attorneys, affiliates, assigns or successors, including without limitation any attempt to recover on an Avoidance Action from any such party, or (e) any act which has or could have the effect of materially modifying any right, remedy, claim, benefit or privilege of Prepetition Lender or Lender, or which is contrary to any term or condition set forth in the Prepetition Financing Agreements, or the Documents. (The proviso above for postpetition loans or other financial accommodations pursuant to Section 364(c) or (d) secured solely by assets not already encumbered by Lender's interests and not having priority over Lender's other rights, interests and claims, and not being conferred any rights more advantageous than those granted to Lender, shall be referred to as "Permitted Borrowing.")

1.4 **"Agreement"** - this Loan and Security Agreement, together with all exhibits and schedules hereto.

1.5 **"Anniversary Date"** – July 18, 2026, and each successive date that is one year after such date or any such successive date.

1.6 **"A/R Advances"** – as defined in Section 2.1.1.

1.7 **"A/R Administrative Fee"** - a fee at the rate of twenty hundredths of one percent (.20%) per month on the average daily balance of the gross face amount of Borrower's accounts outstanding, as determined by Lender in its sole discretion.

1.8 **"A/R Allowable Amount"** – the lesser of the A/R Borrowing Base and the A/R Maximum Commitment.

1.9 **"A/R Borrowing Base"** – eighty-five percent (85%) of the Net Face Amount of Eligible Accounts.

1.10 **"A/R Maximum Commitment"** - $2,500,000.00.

1.11 **"Availability Reserves"** - as of any date of determination, such amounts as Lender may from time to time establish and revise in good faith to reduce the amount of Advances that would otherwise be available to Borrower hereunder: (a) to reflect events, conditions, contingencies and risks that, as determined by Lender in good faith, do or may affect (i) the Collateral or any other property that is security for the Obligations, including the value of the Collateral or such other property, (ii) the assets, business or prospects of Borrower or any other Obligor or (iii) the security interest and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof); (b) to reflect Lender's good-faith belief that any Collateral report or financial information furnished by or on behalf of Borrower or any other Obligor to Lender is or may have been incomplete, inaccurate or misleading in any material respect; (c) in respect of any state of facts that Lender determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default; or (d) the portion of the A/R Advances outstanding that is based on Eligible Accounts due from a single Account Debtor exceeds the sum of (i) 15% of the A/R Advances outstanding (or, in the case of Lee Enterprises, Pet Supplies Plus and Tops Market, LLC, 45% each), plus (ii) unused A/R Advances borrowing availability pursuant to Section 2.1.

1.11.1 "Avoidance Actions" - claims, actions, causes of action, and proceeds thereof arising pursuant to Sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code and, to the extent applicable under the foregoing, Section 550 of the Bankruptcy Code, but specifically excluding claims, actions, or causes of action under Section 549 of the Bankruptcy Code and any proceeds relating thereto or arising therefrom.

1.14 "Bankruptcy Case" - the case commenced by Borrower under chapter 11 of the Bankruptcy Code before the Bankruptcy Court, bearing case no. 1-25-10125.

1.15 "Bankruptcy Court" - the United States Bankruptcy Court for the Western District of New York.

1.16 **"Blocked Account"** – an account maintained at a bank in the name of Borrower and under Lender's control for the benefit of Borrower; provided, however, that Lender's withdrawals therefrom in satisfaction of the Obligations shall comply with the banks requirements with respect to a minimum balance being maintained in the account.

1.17 **"Borrower's Account"** - the deposit account of Borrower, account number [redacted] maintained by Borrower with Northwest Bank at its office located at 100 Liberty Street, Warren, PA 16365 and the deposit account of Borrower, account number [redacted] maintained by Borrower with S&T Bank at its office located at 2032 Front Street, Cuyahoga Falls, OH 44221.

1.17.1 "Cash Collateral" - the cash and noncash rents, issues, profits and proceeds of the Collateral, of any kind and nature, within the meaning of Section 363(a) of the Bankruptcy Code.

1.18 **"Claim"** - any claim, cause of action, action, dispute or controversy between Borrower and Lender, whether sounding in contract, tort or otherwise, that arises out of or relates to (a) any of the Documents, (b) any negotiations or communications relating to any of the Documents, whether or not incorporated into the Documents or any indebtedness evidenced thereby, or (c) any alleged agreements, promises, representations or transactions in connection with any of the foregoing.

1.19 **"Collateral"** - all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired, whether now or hereafter existing (whether prior to the Petition Date or after) and wherever located, together with all collateral now or hereafter described in any UCC Financing Statement filed against Borrower naming Lender as the secured party:

1.19.1 accounts; returned, reclaimed or repossessed goods, and rights as an unpaid vendor, with respect to accounts; contract rights; chattel paper (including electronic chattel paper); general intangibles (including payment intangibles, tax and duty refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names and applications for the foregoing, trade secrets, goodwill, processes, drawings, blueprints, customer lists, software, licenses, whether as licensor or licensee, choses in action and other claims, and existing and future leasehold interests in equipment and fixtures); financial assets; money; documents; instruments, including promissory notes; letters of credit and letter of credit rights; deposit accounts; and commercial tort claims;

1.19.2 goods, including:

1.19.2.1 inventory, wherever located, including raw materials, work-in-process, finished goods, and all names or marks affixed or to be affixed thereto for purposes of selling the same by the seller, manufacturer, lessor or licensor thereof;

1.19.2.2 equipment and fixtures, including motor vehicles, furniture, and any and all additions, substitutions, replacements (including spare parts) and accessions thereof and thereto and any and all software embedded therein; and

1.19.2.3 goods in Borrower's possession, custody or control;

1.19.3 investment property;

1.19.4 books and records relating to any of the above, including all computer programs, printed output and computer-readable data in the possession or control of Borrower, any computer service bureau or any other third party;

1.19.5 claims of Borrower on any policy of insurance, including claims for premium refund under any workmen's compensation policy and claims under any business-interruption or similar coverage; and

1.19.6 products, proceeds and supporting obligations of the foregoing in whatever form and wherever located, including insurance proceeds, claims against third parties for loss or destruction of, or damage to, any of the foregoing, and income from the lease or rental of any of the foregoing.

1.20.7 Notwithstanding any contrary term of this Agreement, Collateral shall not include any waste or other materials than have been or may be designated as toxic or hazardous or any Borrower's right, title and interest in the Avoidance Actions.

"Committee" - any official committee appointed in the Bankruptcy Case under Section 1102 of the Bankruptcy Code.

1.20 **"Credit Accommodation"** - any Advance, loan or other extension of credit by Lender to or on behalf of Borrower hereunder, including any Special Credit Accommodation.

1.21 **"Default Rate"** - four percentage points (4.0%) per annum in excess of the Interest Rate or the Term Loan Interest Rate, as applicable; provided, however, that, to the extent that the Default Rate is calculated by reference to the Index Rate, the Default Rate shall change simultaneously with any change in the Index Rate.

1.22 **"Delinquent Account"** – an account of Borrower that remains uncollected more than ninety (90) days from invoice date.

1.23 **"Documents"** - means collectively, this Amended & Restated Loan and Security Agreement, and all notes, other guarantees, security agreements, subordination agreements, evidences of Special Credit Accommodations, the Financing Orders, and other agreements, documents and instruments now or at any time hereafter executed and/or delivered by Borrower or any Obligor in connection with this Amendment or the Financing Agreement, or otherwise, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.24 **"Eligible Account"** - any account of Borrower, excluding the following:

1.24.1 any Delinquent Account;

1.24.2 any account of Borrower due from an Account Debtor that has suffered a business failure or the termination of its existence, or as to which a dissolution, insolvency or bankruptcy proceeding has been commenced, any assignment for the benefit of creditors has been made, or a trustee, receiver or conservator has been appointed for all or any part of the assets of such Account Debtor;

1.24.3 any account of Borrower due from an Account Debtor affiliated with Borrower in any manner, including as stockholder, owner, partner, member, officer, director, agent or employee;

1.24.4 any account of Borrower with respect to which payment is or may be conditional;

1.24.5 any account of Borrower due from an Account Debtor that is not a resident or citizen of, not located in, or not subject to service of process in, the United States of America; provided, however, that no account shall be excluded from being an Eligible Account pursuant to this Section 1.20.5

if such account is supported by credit insurance or a letter of credit acceptable to Lender in its Sole Discretion;

1.24.6 any account of Borrower due from an Account Debtor that is a unit of government, including any instrumentality, division, agency, body or department thereof, except if the Account Debtor is the United States of America, and the United States of America, Lender and Borrower enter into an assignment of claims agreement in form and substance satisfactory to Lender;

1.24.7 any account of Borrower arising from progress billing, retainage, a "bill and hold" sale or any similar arrangement;

1.24.8 any account of Borrower due from an Account Debtor as to which 25% or more of the aggregate dollar amount of all outstanding accounts owing to Borrower from such Account Debtor are Delinquent Accounts;

1.24.9 that portion of any accounts of Borrower due from a single Account Debtor that is in excess of 15% (or, in the case of Lee Enterprises, Pet Supplies Plus and Tops Market, LLC, 45% each) of the aggregate dollar amount of all outstanding accounts of Borrower;

1.24.10 any account of Borrower due from an Account Debtor as to which the ratio of (a) the aggregate dollar amount owing, or claimed by such Account Debtor to be owing, by Borrower to such Account Debtor to (b) the aggregate dollar amount of all outstanding accounts owing by such Account Debtor to Borrower exceeds 20% (or, with respect to particular Account Debtors, such higher percentage as Lender may from time to time agree to in its sole discretion); provided, however, that, if such ratio is 20% (or such higher percentage as so agreed to) or less, then the foregoing shall not apply, and instead the aggregate dollar amount owing, or claimed by such Account Debtor to be owing, from Borrower to such Account Debtor shall be deducted from the aggregate amount of Eligible Accounts due from such Account Debtor;

1.24.11 any account of Borrower that is not solely owned by Borrower and subject to a first priority security interest in favor of Lender, and free of all liens, encumbrances, charges, rights and interests of any kind (other than in favor of Lender);

1.24.12 any account of Borrower that is supported or represented by a promissory note, post-dated check or letter of credit, unless such instrument is actually delivered to Lender and endorsed or assigned to the satisfaction of Lender;

1.24.13 any account of Borrower as to which the related Account Debtor disputes liability, or has any defense, claim, offset, right of cancellation or return, or as to which the Account Debtor is unwilling to verify the outstanding amount;

1.24.14 any account of Borrower arising from a transaction wherein all property giving rise to such account and/or all services giving rise to such account have not been delivered and/or rendered to, and unconditionally accepted by, the applicable account debtor, including pre-billed accounts;

1.24.15 any account of Borrower arising from sales or services rendered to an individual consumer for personal, family or household purposes;

1.24.16 any account of Borrower arising from jobs or contracts with respect to Borrower's payment or performance is the subject of a bond or other suretyship contract; and

1.24.17 any account of Borrower that is un-creditworthy or unsuitable for purposes of determining the A/R Borrowing Base, as determined by Lender in its Sole Discretion.

1.25 **"Eligible Inventory"** - inventory that:

1.25.1 is solely owned by Borrower and is free of all liens, encumbrances, charges, rights and interests of any kind (other than those in favor of Lender);

1.25.2 is permanently located at locations at which Borrower conducts business in the State of New York (or such other states as to which Lender has given its advance consent in writing) and if Borrower is not the owner of a location, Borrower (if required by Lender) shall cause Lender to receive from third party owners or lessors (as applicable) landlords' waivers, warehousemans' waivers and/or bailee waivers, in form acceptable to Lender; and is not covered by a negotiable document of title or warehouse receipt (unless such document has been delivered to Lender and Lender has given its advance consent in writing thereto);

1.25.3 in Lender's reasonable opinion, is not obsolete, unsalable, damaged, or unfit for further processing;

1.25.4 does not consist of miscellaneous supplies, display items, packing and shipping materials, discontinued or slow-moving items, or finished goods of substandard quality;

1.25.5 is not placed by Borrower on consignment;

1.25.6 is not branded or customer specific in nature;

1.25.7 is of a type held for sale in the ordinary course of Borrower's business; and

1.25.8 is otherwise suitable for purposes of determining the Inventory Borrowing Base, as determined by Lender in its Sole Discretion.

1.26 **"Event of Default"** – as defined in Section 10.1.

1.29 "Final Financing Order" - an order, and related findings of fact and conclusions of law in support thereof, of the Bankruptcy Court entered in the Bankruptcy Case after a final hearing pursuant to Bankruptcy Rule 4001(c)(2) authorizing on or after the Petition Date, the incurrence of indebtedness by Borrower, the provision of loans, advances and other financial accommodations by Lender to Borrower, and the granting of liens, interests, priority claims and other rights in favor of Lender pursuant to the Documents, pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code, in form and substance acceptable to Lender in its sole and absolute discretion, as the same may be amended, supplemented or otherwise modified from time to time, and that is not subject to any stay pending any appeal or petition for certiorari, review, rehearing or reconsideration.

1.30 **"Financing Order(s)"** - collectively, the Interim Financing Order, the Final Financing Order, and such other orders, and related findings of fact and conclusions of law in support thereof, relating thereto or authorizing on or after the Petition Date, the incurrence of indebtedness by Borrower, the provision of loans, advances and other financial accommodations by Lender to Borrower, the granting of liens, interests, priority claims and other rights in favor of Lender pursuant to the Documents, on an emergency, interim, final or other basis pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code as may be issued or entered in the Bankruptcy Case, each and all in form and substance acceptable to Lender in its sole and absolute discretion.

1.31 **"Guarantors"** - all Persons now or hereafter guaranteeing the Obligations, including without limitations any signatory under any Validity Indemnification.


Case 1-26-01021-CLB, Doc 1, Filed 09/25/26, Entered 09/25/26 14:36:54, Description: Main Document , Page 27 of 72

1.32 **"Guaranty"** - a continuing guaranty in form and substance acceptable to Lender by which a Guarantor guarantees the Obligations.

1.33 **"Index Rate"** – the variable rate of interest per annum equal to the Term SOFR Reference Rate for a tenor of one month on the day that is two (2) U.S. Government Securities Business Days prior to the first day of each Interest Period, as such rate is published by the Term SOFR Administrator. As used herein: **"Term SOFR Reference Rate"** means the forward-looking term rate based on the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate; **"U.S. Government Securities Business Day"** means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities; **"Interest Period"** means a period commencing on the first day of a calendar month and ending on the last day of such calendar month; and **"Term SOFR Administrator"** means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender).

1.34 **"Initial Funding Date"** – the date on which the first Credit Accommodation is made.

1.35 **"Interest Rate"** – (a) with respect to A/R Advances, the variable rate of interest per annum equal to the greater at all times of (i) seven percent (7%), per annum in excess of the Index Rate in effect from time to time or (ii) eleven and one-quarter percent (11.25%) per annum; and (b) with respect to Inventory Advances, the variable rate of interest per annum equal to the greater at all times of (i) seven percent (7%), per annum in excess of the Index Rate in effect from time to time or (ii) eleven and one-quarter percent (11.25%) per annum; provided, however, that, to the extent the Interest Rate with respect to A/R Advances or Inventory Advances is calculated by reference to the Index Rate, any change in such Interest Rate(s) shall be effective as of the first day of the calendar month following the date of any change in the Index Rate.

"Interim Financing Order" - an order, and related findings of fact and conclusions of law in support of such order, of the Bankruptcy Court entered in the Bankruptcy Case after a hearing held within 15 days after service of a motion requesting issuance and entry of a Financing Order under Bankruptcy Rule 4001(b)(2) and (c)(2), authorizing on or after the Petition Date, the incurrence of indebtedness by Borrower, the provision of loans, advances and other financial accommodations by Lender to Borrower, and the granting of liens, interests, priority claims, and other rights in favor of Lender pursuant to the Documents, pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code, in form and substance acceptable to Lender in its sole and absolute discretion, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent of Lender as may be required to approve such modifications, that is not subject to any stay pending any appeal or petition for certiorari, review, rehearing, or reconsideration.

1.36 **"Inventory Administrative Fee"** – twenty hundredths of one percent (.20%) per month on the average daily inventory of Borrower, as determined by Lender in its sole discretion.

1.37 **"Inventory Advances"** – as defined in Section 2.1.1.

1.38 **"Inventory Allowable Amount"** – the lesser of the Inventory Borrowing Base and the Inventory Maximum Commitment.

1.39 **"Inventory Borrowing Base"** - fifty percent (50%) of Eligible Inventory.

1.40 **"Inventory Maximum Commitment"** - $500,000.00.

1.41 **"Key Employees"** – Thomas J. Majerski and Carl A. Rosati, III.

1.42 **"Lending Office"** - Lender's office referred to in Section 21.1.

1.43 **"Lien"** - any lien, pledge, security interest, encumbrance or charge of any kind, including any conditional-sale or other title-retention arrangement and any similar preferential arrangement.

1.44 **"Loan Fee"** - $36,110.00.

1.45 **"Minimum Monthly Charge"** - $7,500.00.

1.46 **"Monetary Collateral"** – money, cash, checks and other means of payment in tangible or intangible form from whatever source (including in the form of electronic wire transfer or other electronic funds-transfer mechanism), whether constituting original Collateral upon Borrower's obtaining receipt thereof of rights therein or whether constituting proceeds of Collateral.

1.47 **"Negotiable Collateral"** - as defined in Section 5.5.1.

1.48 **"Net Face Amount"** - with respect to an account of Borrower, the gross face amount of such account, less all trade discounts or other deductions to which the Account Debtor is entitled.

1.49 **"Obligated Party"** - as defined in Section 5.2.

1.50 **"Obligations"** - all present and future obligations owing by Borrower to Lender, whether or not for the payment of money, whether or not evidenced by a note or other instrument or an Advance, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar statute, including in any event: obligations in respect of the Revolving Credit Facility (including the Advances and Special Credit Accommodations) and the Term Loan; obligations arising pursuant to letters of credit, acceptance transactions or any other financial accommodations; and all principal, interest, fees, charges, expenses, indemnities, attorneys' fees and accountants' fees chargeable to Borrower or incurred by Lender in connection with this Agreement and/or the transaction(s) related hereto.

1.51 **"Obligors"** - Borrower and all Guarantors.

1.52 **"Person"** – an individual, a corporation, a limited liability company, a partnership, an association, a business trust or any other entity or organization, including any national, federal state or local government, any political subdivision thereof, and any governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body or entity.

1.54 "Petition Date" - the date of the commencement of the Bankruptcy Case.

1.55 "Prepetition Agreement" - that certain Loan and Security Agreement, dated as of June 30, 2023, between Borrower and Prepetition Lender, as amended, modified, supplemented and restated as of the Petition Date.

1.56 "Prepetition Collateral" - "Collateral" as defined in the Prepetition Agreement other than Collateral acquired after the Petition Date within the meaning of Section 552(a) of the Bankruptcy Code.

1.57 "Prepetition Financing Agreements" - collectively, the Prepetition Agreement and any other agreements, instruments, certificates or other documents entered into in connection with the Prepetition Agreement, including collateral documents, letter of credit agreements, security agreements, pledges, guaranties, mortgages, deeds of trust, assignments, and subordination agreements, and any other agreements executed by Borrower, any guarantor or any affiliate of Borrower pursuant hereto or in connection herewith.

1.58 "Prepetition Lender" - Lender under the Prepetition Financing Agreement.

1.59 "Prepetition Liens" - all liens on and security interests in the Prepetition Collateral in favor of Prepetition Lender.

1.60 "Prepetition Obligations" - all Obligations existing before the Petition Date.

1.61 **"Professionals"** - any attorneys, accountants, advisors, consultants, appraisers, brokers, investment bankers, and other professionals retained or employed under Section 327 or 1103(a) by Borrower or any official committee appointed in the Bankruptcy Cases under Section 1102 of the Bankruptcy Code.

1.62 **"Reference"** - a judicial reference conducted pursuant to this Agreement in accordance with the law of the State of California, as in effect at the time the referee is selected pursuant to Section 21.8.1.

1.63 "Release Party" - has the meaning set forth in Section 5.3.

"Releasing Parties" - has the meaning set forth in Section 5.3.

1.64 **"Revolving Credit Facility"** – Lender's agreement to make Advances to Borrower pursuant to Section 2.1.

1.65 **"Sole Discretion"** – means the exercise by Lender of its reasonable (from the perspective of a secured asset based lender) good faith business judgment in light of all of the facts and circumstances existing with respect to the issue then under consideration by Lender.

1.66 **"Special Credit Accommodation"** - as defined in Section 2.1.3.

1.67 **"Special Credit Accommodation Fee"** - three percent (3%) of the original amount of any Special Credit Accommodation.

1.68 **"Subordinating Creditor"** - none.

1.69 **"Subordination Agreement"** - a subordination agreement in form and substance acceptable to Lender whereby a Subordinating Creditor subordinates in favor of Lender (a) obligations owed to such Subordinating Creditor by Borrower and/or (b) a Lien on property of Borrower in favor of such Subordinating Creditor.

1.70 **"Termination Date"** – the date on which this Agreement is terminated in accordance with its terms.

1.71 **"Term Loan"** – as defined in Section 2.2.

1.72 **"Term Loan Administrative Fee"** - a fee at the rate of twenty hundredths of one percent (.20%) per month on the aggregate appraised value, as determined by Lender in its sole discretion, of the equipment whose purchase was financed or refinanced by the Term Loan.

1.73 **"Term Loan Interest Rate"** - the variable rate of interest per annum equal to the greater at all times of (i) seven percent (7%) per annum in excess of the Index Rate in effect from time to time or (ii) eleven and one-quarter percent (11.25%) per annum; provided, however, that, to the extent the Term Interest Rate is calculated with reference to the Index Rate, any change in the Term Loan Interest Rate shall be effective as of the first day of the calendar month following the date of any change in the Index Rate.

1.74 **"Term Note"** – the promissory note, substantially in the form attached hereto as Exhibit D, executed by Borrower in favor of Lender to evidence the Term Loan.

1.76 **"Validity Indemnification"** - a letter agreement which addresses, among other things, the validity of all accounts receivable of Borrower and certain other issues relating to such accounts receivable, to the extent applicable to this transaction.

2. **Credit Facilities.**

2.1 **Revolving Credit Facility.** Subject to the terms and conditions of this Agreement, from the date on which this Agreement becomes effective until termination pursuant to the terms hereof:

2.1.1 **Advances.** Lender will from time to time make advances ("A/R Advances") to Borrower so long as, before and after each such A/R Advance, the Obligations relating only to A/R Advances do not exceed the A/R Allowable Amount, less any Availability Reserves. In addition, Lender will from time to time make advances ("Inventory Advances") to Borrower, less any Availability Reserves, so long as, before and after each such Inventory Advance, the Obligations relating only to Inventory Advances do not exceed the Inventory Allowable Amount; provided, however, that the aggregate advances and other extensions of credit by Lender to Borrower for the purpose of financing inventory may not exceed 80% of the aggregate sum of (a) advances and other extensions of credit by Lender to Borrower for the purpose of financing accounts receivable, plus (b) unused A/R Advances borrowing availability pursuant to Section 2.1.

2.1.2 **Reduction of A/R Borrowing Base or Inventory Borrowing Base.**

2.1.2.1 Lender may, in its Sole Discretion from time to time, reduce the A/R Borrowing Base to the extent Lender determines in good faith that: (a) the dilution with respect to the accounts of Borrower for any period (based on the ratio of (i) the aggregate amount of reductions in such accounts other than as a result of payments in cash to (ii) the aggregate amount of total sales) has increased in any material respect or may be reasonably anticipated to increase in any material respect above historical levels; (b) the accuracy of Borrower's record-keeping with respect to its accounts is called into question for good reason; or (c) the general creditworthiness of Account Debtors has declined. In determining whether to reduce the A/R Borrowing Base, Lender may consider events, conditions, contingencies or risks that are also considered in determining Eligible Accounts or in establishing Availability Reserves.

2.1.2.2 Lender may, in its Sole Discretion from time to time, reduce the Inventory Borrowing Base to the extent Lender determines in good faith that: (a) the rate of turnover of Inventory has decreased in any material respect or may be reasonably anticipated to decrease in any material respect below historical levels; (b) the accuracy of Borrower's record-keeping with respect to Inventory is called into question for good reason; or (c) the Inventory becomes obsolete in any material respect or may be reasonably anticipated to become obsolete in any material respect. In determining whether to reduce the Inventory Borrowing Base, Lender may consider events, conditions, contingencies or risks that are also considered in determining Eligible Inventory or in establishing Availability Reserves.

2.1.3 **Special Credit Accommodations.** Lender may, in its sole and absolute discretion from time to time upon request by Borrower, make Advances to Borrower in excess of the A/R Allowable Amount or the Inventory Allowable Amount (any Advance extended to Borrower pursuant to this section being a "Special Credit Accommodation").

2.1.4 **General Provisions Relating to Revolving Credit Facility.**

2.1.4.1 **Crediting of Borrower's Account.** Advances by Lender may be made by deposits or transfers to Borrower's Account.

2.1.4.2 **Authorization for Credit Accommodations.** Subject to the terms and conditions of this Agreement, Lender is authorized to make Credit Accommodations:

2.1.4.2.1 upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Borrower;

2.1.4.2.2 upon electronic instructions received from anyone with access to request Advances through Lender's website; or

2.1.4.2.3 at the sole discretion of Lender, and notwithstanding any other provision of this Agreement, if necessary to meet any Obligations, including any interest not paid when due.

2.2 **Term Loan.** Subject to the terms and conditions of this Agreement, on or after the date hereof Lender will make a term loan to Borrower in the amount of six hundred ten thousand nine hundred sixty dollars ($610,960.00) (the "Term Loan"). The Term Loan shall be evidenced by the Term Note.

2.3 **Use of Proceeds.** The Advances and Special Credit Accommodations shall be used by Borrower (a) to repay on the date that the first Credit Accommodation is made hereunder, all outstanding indebtedness owing to Borrower's incumbent lender (if any), and (b) thereafter, for ordinary working capital purposes unless otherwise agreed in writing by Lender, provided, further, Borrower will not use proceeds of the Advances or Special Credit Accommodations in connection with or relating to an Adverse Action..

3. **Payments by Borrower.**

3.1 **Payment of Credit Accommodations and Other Obligations.** Borrower will repay the Credit Accommodations and pay the other Obligations in accordance with the terms of this Agreement and the other Documents. The Credit Accommodations and other Obligations may be evidenced by a promissory note, invoice, statement, electronic record, entry on Lender's records or otherwise.

3.1.1 **Advances.** Borrower will repay the outstanding Advances in full on the Termination Date.

3.1.2 **Special Credit Accommodations.** Borrower will repay all Special Credit Accommodations on the earlier to occur of (a) the date on which demand for repayment is made by Lender and (b) the Termination Date.

3.1.3 **Term Loan.** Borrower will repay the Term Loan in accordance with the terms of the Term Note but in any event not later than the Termination Date.

3.2 **Interest.**

3.2.1 **Basic Interest.** Subject to Section 3.2.2, interest on the Obligations shall be payable monthly in arrears and shall be computed (a) in the case of the Advances, at the Interest Rate and (b) in the case of the Term Loan, at the Term Loan Interest Rate. All interest payable hereunder shall be due on the first day of each calendar month following the accrual thereof.

3.2.2 **Default Interest.** Upon the occurrence and during the continuation of an Event of Default, Borrower will pay interest to Lender on the Obligations at the Default Rate, in lieu of basic interest as described in Section 3.2.1, payable monthly in arrears (or from time to time upon demand by Lender), before as well as after judgment.

3.3 **Fees.**

3.3.1 **Loan Fee.** Borrower will pay the Loan Fee to Lender, without offset, deduction, demand or proration, (a) concurrently with the first Credit Accommodation hereunder (the "Loan Fee Date") and (b) on each anniversary of the Loan Fee Date. Any portion of the Loan Fee not paid when due shall accrue interest at the Interest Rate. As a one-time accommodation, Borrowers will be credited the amount of $15,000.00 against the Loan Fee that was charged in July 2024.

3.3.2 **Administrative Fee.** Borrower will pay Lender the Administrative Fee monthly, in arrears, on the first day of each calendar month following the accrual thereof.

3.3.3 **Special Credit Accommodation Fee.** Simultaneously with the making of each Special Credit Accommodation, Borrower will pay to Lender the applicable Special Credit Accommodation Fee.

3.3.4 **Late-Reporting Fee.** If Borrower fails to deliver to Lender, within five (5) business days after the date on which Borrower is obligated to deliver the same to Lender pursuant to this Agreement or any other Document, any accounts receivable aging report, accounts payable aging report, inventory report, customer master report or other information specified by Lender that Borrower is obligated to provide to Lender pursuant to this Agreement or any other Document, Borrower will pay Lender a late-reporting fee of $50 for each instance in which any such report or information is not delivered to Lender within five (5) business days after the required date. In addition, Borrower will pay Lender a late-reporting fee of $250 for each week or part thereof that any financial statement required to be provided by Borrower to Lender pursuant to Section 8.1.1 or 8.1.2 is not delivered to Lender by the applicable date specified therein.

3.3.5 **Misdirected-Payment Fee.** If any payment on an account of Borrower is (a) received by Borrower in the form of a check and (i) deposited into any account other than a Blocked Account or (ii) in any case not deposited into a Blocked Account within five (5) business days after receipt by Borrower or (b) received by Borrower by wire transfer and (i) transferred to any account other than a Blocked Account or (ii) in any case not transferred to a Blocked Account within three (3) business days after receipt by Borrower, Borrower will immediately pay to Lender, in addition to such payment, the amount equal to fifteen percent (15%) of the amount of such payment. Promptly after the Initial Funding Date, Borrower will direct all of its Account Debtors that make payments on accounts by wire transfer to make all such payments directly into a Blocked Account.

3.3.6 **Manual-Processing Fee.** If, within sixty (60) days after the date of this Agreement, Borrower does not commence delivering accounts receivable aging reports and customer master reports to Lender in an electronic format acceptable thereto and Borrower's system are able to provide the reports in an acceptable manner, Borrower will thereafter pay Lender a manual-processing fee of $250 for each such report that is not so delivered to Lender.

3.3.7 **Funds-Transfer Fee.** Borrower will pay to Lender, without duplication, (a) a fee of $25 for the first outgoing wire-transfer of funds to Borrower on any business day, (b) a fee of $50 for each subsequent outgoing wire-transfer of funds to Borrower on the same business day, (c) a fee of $50 for each outgoing wire-transfer of funds other than to Borrower, (d) a fee of $75 for each outgoing wire-transfer of funds outside the United States of America, and (e) a fee of $20 for each incoming wire transfer of funds to Celtic from any Borrower owned bank account blocked for the benefit of Celtic.

3.3.8 **Minimum Monthly Charge.**

3.3.8.1 For any full calendar month in which the sum of (i) interest and (ii) the Administrative Fee earned by Lender is less than the Minimum Monthly Charge, Lender will debit the difference to the Obligations as of the first day of the following calendar month, until the date on which all Obligations have been repaid (whether or not this Agreement has theretofore been terminated).

3.3.8.2 In the event that this Agreement begins on other than the first day of a calendar month or that the Obligations are fully repaid on other than the last day of a calendar month, the preceding section shall apply pro rata to such month.

3.3.9 **Termination Charge.** If this Agreement and all of Lender's obligations hereunder are terminated pursuant to Section 10.2.1.1 or 10.2.2.1 (irrespective of whether Lender has previously given notice of termination to Borrower pursuant to Section 11.1), or if Borrower requests Lender to consent to termination of the Revolving Credit Facility on a date earlier than Section 11.2 permits, then Borrower will pay to Lender, promptly upon demand, a termination charge in the amount equal to 1% of the sum of the A/R Maximum Commitment, the Inventory Maximum Commitment and the principal amount of the Term Loan then outstanding if the Termination Date occurs after the second anniversary of the Initial Funding Date; provided, however, that if Borrower pays off the obligations and the Revolving Credit Facility is terminated due to a refinancing of the Obligations provided by a commercial bank to Borrower, then no termination charge shall be payable by Borrower hereunder provided that (1) Borrower provides Lender at least sixty days' notice prior to said payoff and (2) said payoff occurs on or after the second anniversary of the Initial Funding Date.

3.4 **In General.**

3.4.1 **Place of Payments.** All payments by Borrower hereunder shall be made to Lender at the Lending Office, or at such other place as Lender may designate to Borrower in writing.

3.4.2 **Crediting of Payments.**

3.4.2.1 **Receipt and Application of Payments.** Funds that are transferred from a Blocked Account to Lender's designated account by 6:00 a.m., Pacific time, on a business day shall be deemed to have been received by Lender on the same business day and shall be applied to payment of the Obligations on that day (except as otherwise provided in Section 3.4.2.2); funds that are transferred from a Blocked Account to Lender's designated account after 6:00 a.m., Pacific time, on a business day shall be deemed to have been received by Lender on the following business day and shall be applied to payment of the Obligations on that day (except as otherwise provided in Section 3.4.2.2). Such funds shall be applied to payment of the Obligations in such manner and order as Lender may elect in its sole discretion.

3.4.2.2 **A/R Advances**. All payments received by Lender for the account of Borrower shall, for the purpose of computation of interest on the A/R Advances (but not for any other purpose), be credited to the A/R Advances on the fifth (5th) business day after receipt by Lender, as determined in accordance with Section 3.4.2.1.

3.4.2.3 **Generally.** No payments received by Lender purportedly in satisfaction of any of the Obligations shall constitute payment thereof unless and until final payment thereof. All fees paid by Borrower pursuant to this Agreement shall be nonrefundable.

3.4.3 **Prepayments; Application of Payments.**

3.4.3.1 **Advances.** Borrower shall have the right to make payments at any time in reduction of the Advances, in whole or in part; provided, however, that Lender may apply any payments received to the Advances in such manner and order as Lender may elect its sole discretion.

3.4.3.2 **Term Loan.** Borrower shall have the right to make payments at any time in reduction of the Term Loan, in whole or in part; provided, however, that Lender may apply any payments received to the installments of the Term Loan in such manner and order as Lender may elect in its sole discretion. If Borrower satisfies in full its obligations under the Revolving Credit Facility, Borrower must concurrently satisfy in full its obligations in respect of the Term Loan.

3.4.3.3 Notwithstanding any contrary term of this Agreement, all payments of Collateral or other consideration received or collected from a Borrower or for the account of any Borrower or Obligor shall be deemed to be applied to Prepetition Obligations first and then to Obligations arising after the Petition Date.

3.4.4 **Calculation of Interest and Fees.** All interest and fees charged hereunder shall be computed on the basis of a 360-day year for the actual number of days elapsed. Notwithstanding anything to the contrary contained herein, any interest rate calculated hereunder shall be rounded to the closest 1/8 of 1%, with no adjustments made for rate changes of less than 1/8 of 1%.

4. **Grant of Security Interest**. To secure the payment and performance of the Obligations, Borrower hereby grants to Lender a continuing security interest in the Collateral. Lender is expressly authorized to execute and/or file UCC-1 financing statements, and amendments and continuations thereto in order to perfect, and continue the perfection of, Lender's security interest in the Collateral. If Borrower has or shall acquire a commercial tort claim, Borrower shall promptly notify Lender in a writing signed by Borrower of the general details thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Lender.

5. **Collection and Administration of Accounts.**

5.1 **Collection.**

5.1.1 **Monetary Collateral.** Borrower is authorized to collect Monetary Collateral on behalf of and in trust for Lender, in accordance with the terms hereof and at Borrower's expense; provided, however, that, after the occurrence of an Event of Default, Lender may modify or terminate such authority at any time, in its sole discretion, and may collect any of the Monetary Collateral directly. Borrower will, at Borrower's expense and in the manner requested by Lender from time to time, direct that Monetary Collateral be (or, if received by Borrower, will immediately cause the same in kind to be) (a) sent to Lender's address as designated by Lender, and/or (b) deposited into a bank account maintained in the name of Lender and/or into a blocked bank account under arrangements with the depository bank under which all funds deposited to such blocked bank account are required to be transferred to Lender. In connection with the foregoing, Borrower will execute such blocked bank account agreements as Lender reasonably requires.

5.1.2 **Electronic Proceeds of Collateral.** If any Account Debtor is to make payment to Borrower by wire transfer or other electronic funds-transfer mechanism, Borrower will direct such Account Debtor to make such payment directly to a bank account designated by Lender from time to time. In the event that Borrower otherwise receives any proceeds of Collateral from any Person in the form of a wire transfer or other electronic funds-transfer mechanism, Borrower will immediately pay such proceeds to Lender (or cause the same to be paid to Lender) by wire transfer.

5.2 **Lender's Powers.** Borrower hereby authorizes Lender and any designee of Lender, at Borrower's sole expense, to exercise in Lender's or such designee's sole discretion any or all of the following powers, which powers are irrevocable until the Obligations have been paid in full and Lender's obligation to make Credit Accommodations has terminated: (a) to receive, take, endorse, assign, deliver, accept and deposit, at any time and in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof; (b) to request from any Person, including any Account Debtor, obligated with respect to any Collateral, including accounts (an "Obligated Party"), or any bailee, at any time and in the name of Borrower, Lender or any designee of Lender (or by a pseudonym), verification of any amounts owing with respect to the Collateral or any other information concerning the Collateral, authorization of which is in the form attached hereto as Exhibit A; (c) at any time after the occurrence of an Event of Default, to notify any Obligated Party, by means of a letter substantially in the form attached hereto as Exhibit B, that the Collateral has been assigned to Lender by Borrower and that payment of accounts and other Collateral is

to be made to the order of and directly and solely to Lender, or to notify any bailee as to the disposition of Collateral; (d) at any time after the occurrence of an Event of Default, to require that all invoices and statements sent by Borrower to any Obligated Party or any bailee state that the Collateral has been assigned to Lender and that any payments in respect thereof are to be made directly and solely to Lender; (e) at any time after the occurrence of an Event of Default, to take or bring, in the name of Lender or Borrower, all such actions, suits or proceedings as Lender may deem necessary or desirable to demand, collect, enforce payment of and otherwise realize upon the Collateral (but without any duty to do so, and Lender shall not be liable for any failure to collect or enforce payment thereof); (f) at any time after the occurrence of an Event of Default, to change the address for delivery of mail to Borrower, and to receive and open mail addressed to Borrower; (g) at any time after the occurrence of an Event of Default, to extend the time of payment of, compromise, or settle for cash, credit or return of merchandise, any and all accounts or other Collateral, and to discharge or release any Obligated Party without affecting any of the Obligations, in each case upon any terms and conditions; (h) to execute in the name of Borrower and to file against Borrower in favor of Lender, at any time, financing statements or amendments thereto with respect to any or all of the Collateral; and (i) to execute in the name of Borrower, and to file on behalf of Borrower with such governmental authorities as are appropriate, at any time, such documents (including applications and certificates) as may be required for the purpose of having Borrower qualified to transact business in a particular state or geographic location.

5.3 Release.

5.3.1 Borrower, on behalf of itself and subject to the terms of the Financing Orders, acknowledges, confirms and agrees that it has no defense, counterclaim, offset, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of Borrower's liability to repay Lender or to seek affirmative relief or damages of any kind or nature from Lender. Borrower, together with its successors, assigns, subsidiaries and affiliates (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Lender (including in its respective capacity as Prepetition Lender) and all of each of such party's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of them (collectively, "Released Parties") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, diminution in value, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses), whether known or unknown, fixed or contingent, direct or indirect, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing or heretofore existing against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Prepetition Financing Agreements and the transactions contemplated hereby. Effective upon the execution hereof, and notwithstanding any failure of Borrower to satisfy any of the conditions precedent set forth herein, the Releasing Parties hereby agree that, without any further act, Lender, together with each of its officers, directors, employees, counsel, agents, and attorneys in fact, are fully and forever released and discharged from any and all claims for damages or losses to the Releasing Parties (whether these damages or losses are known or unknown, foreseen or unforeseen) including, without limitation, tort claims, demands, actions and causes of action of any nature, whatsoever arising under or relating to the Prepetition Financing Agreements or any of the transactions related thereto, prior to the date hereof, and the Releasing Parties waive

application of California Civil Code Section 1542. The Releasing Parties certify that they have read the following provisions of California Civil Code Section 1542:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

5.3.2 The Releasing Parties understand and acknowledge that the significance and consequence of this waiver of California Civil Code Section 1542 is that even if it should eventually suffer additional damages arising out of the facts referred to above, it will not be able to make any claim for those damages. Furthermore, the Releasing Parties acknowledge that they intend these consequences even as to claims for damages that may exist as of the date of this release but which they do not know exist, and which, if known, would materially affect their decision to execute this Agreement, regardless of whether their lack of knowledge is the result of ignorance, oversight, error, negligence, or any other cause. The Releasing Parties understand, acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

5.3.3 Each Releasing Party, on behalf of itself and its successors, assigns, and other legal representatives, but specifically excluding any trustee appointed in the Bankruptcy Case, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Released Party that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any claim released, remised and discharged by any Released Party pursuant to this Section 7.4. If any Releasing Party violates the foregoing covenant, the Releasing Parties agree to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all reasonable attorneys' fees and costs incurred by any Released Party as a result of such violation. The releases pursuant to this Section 7.4 are effective notwithstanding anything contrary contained in the Documents.

5.4 **No Modification of Accounts.** After written notice by Lender to Borrower, and automatically, without notice, after an Event of Default, Borrower will not, without the prior written consent of Lender in each instance, (a) grant any extension of time for payment of any account of Borrower, (b) compromise or settle any such account for less than the full amount thereof, (c) release in whole or in part any Obligated Party or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any such account.

5.5 **Delivery of Collateral and Information Concerning Collateral.** At such times as Lender may reasonably request and in the manner reasonably specified by Lender, Borrower will promptly deliver to Lender or Lender's representative original invoices, agreements, proofs of rendition of services and delivery of goods, and other documents evidencing or relating to the transactions that gave rise to any of the Collateral, together with customer statements, schedules describing Borrower's accounts, statements of account and/or confirmatory assignments to Lender of Borrower's accounts, in form and substance satisfactory to Lender and duly executed by Borrower. Without limiting the provisions of any other section of this Agreement, Borrower will promptly notify Lender in writing of Borrower's granting of credits, discounts, allowances, deductions, return authorizations or the like with respect to any of its accounts, other than in the ordinary course of Borrower's business. In no event shall any such schedule or confirmatory assignment (or the absence thereof or omission of any account therefrom) limit or in any way be construed as a waiver, limitation or modification of any Lien or right of Lender or any warranty, representation or covenant of Borrower under this Agreement.

5.5.1 In addition, in the event that any Collateral, including proceeds, is evidenced by or includes a letter of credit, advice of credit, instrument, money, negotiable document, chattel paper or similar property (collectively "Negotiable Collateral"), Borrower will, immediately upon written request therefor from Lender, endorse and assign such Negotiable Collateral over to Lender (to the extent applicable) and deliver actual physical possession of such Negotiable Collateral to Lender.

5.6 **Inspection.** From time to time and at the sole expense of Borrower, but in no event more than three times per year (unless an Event of Default has occurred and is continuing), Lender or its designee shall have access, upon reasonable notice by Lender and during reasonable business hours if prior to an Event of Default and without notice and at any time if after an Event of Default, to all premises where Collateral is located for the purpose of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Borrower's books and records, and Borrower will permit Lender or its designee to make such copies of such books and records or extracts therefrom as Lender may request. Without expense to Lender, Lender may use any of Borrower's personnel, equipment (including computer equipment, programs, printed output and computer-readable media), supplies and premises for the collection of Borrower's accounts and realization on other Collateral as Lender, in its sole discretion, deems appropriate. Borrower hereby irrevocably authorizes all accountants and third parties, substantially in the form attached hereto as Exhibit C, to disclose and deliver to Lender at Borrower's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Borrower. In addition to the foregoing, Borrower hereby authorizes Lender at any time to access electronically any information concerning accounts maintained by Borrower with any bank or other financial institution, so long as such access is in furtherance of, or to monitor compliance with, the terms of this Agreement.

6. **Conditions Precedent to All Credit Accommodations.**

6.1 Subject to the other terms and conditions contained in this Agreement, Lender's obligation to make the first and all subsequent Credit Accommodations available to Borrower is subject to the satisfaction or waiver of, immediately prior to or concurrently with the making of such Credit Accommodation, the conditions precedent set forth below.

6.1.1 **Documents and Other Acts.** This Agreement and all other Documents required by Lender shall have been executed by Borrower and all other parties thereto, and the resolution and/or completion, to Lender's satisfaction, of all other matters or acts required by Lender in connection with the transactions contemplated by this Agreement.

6.1.2 **Representations and Warranties.** All representations and warranties to Lender set forth herein or in any of the other Documents shall be true, accurate and complete in all respects.

6.1.3 **No Event of Default.** There shall not exist an Event of Default or an event that with the giving of notice or the passage of time, or both, would be or become an Event of Default.

6.1.4 **Payment of All Fees.** Borrower shall have paid to Lender all accrued and unpaid fees and other amounts due and payable under this Agreement, including all of Lender's attorneys' fees.

6.1.5 **Bankruptcy Events**. Lender has no obligation to make any Credit Accommodations to Borrower unless and until a Financing Order, acceptable to Lender in its sole discretion, shall have been issued and entered in the Bankruptcy Case and shall be and continue to be in full force and effect at all times.

6.1.6 Lender shall have received duly executed reaffirmations of Validity Indemnifications from each person as set forth at the end of this Agreement.

6.2 **Conditions to Lender's Obligation to Lend.** All conditions to Lender's obligation to make Credit Accommodations hereunder are imposed solely and exclusively for the benefit of Lender and may be freely waived in whole or in part by Lender at any time.

7. **Representations, Warranties and Covenants of Borrower.** Borrower represents, warrants and covenants to Lender as set forth below, the truth and accuracy of which and compliance with which shall be continuing conditions to the making of any Credit Accommodations, with Borrower agreeing to immediately advise Lender if any representation or warranty below is untrue.

7.1 **Ownership and Priority Interest.** All Collateral is solely owned by Borrower and no Person other than Lender has or will have any interest in the Collateral, including any Lien on the Collateral, except as permitted by Section 9.

7.2 **Accounts.** At all times, as to each account of Borrower: (a) each is valid and legally enforceable and represents an undisputed bona fide indebtedness incurred by the Account Debtor thereon for the sum reported to Lender; (b) each arises from an absolute and unconditional sale of goods, without any right of return or consignment, or from a completed rendition of services; (c) none is subject to any defense, offset, dispute, contra relationship or counterclaim or to any given or claimed credit, allowance or discount; and (d) all statements made, and all unpaid balances and other information appearing, in the invoices, agreements, proofs of rendition of services and delivery of goods, and other documentation relating to each account of Borrower, and all confirmatory assignments, schedules, statements of account, and books and records with respect thereto, are true and correct and in all material respects what they purport to be.

7.3 **Condition and Location of Equipment.** All of Borrower's equipment is, and Borrower will keep all of its equipment, in good order and repair and in running and adequate marketable condition, ordinary wear and tear excepted, and such equipment shall not be stored with a bailee, warehouseman, or third party without Lender's prior written consent.

7.4 **Inventory Records and Location.** Borrower shall at all times keep correct and accurate books and records itemizing and describing the type, quantity and cost of all of its inventory, and such inventory shall not be stored with a bailee, warehouseman, or third party without Lender prior written consent.

7.5 **Eligible Accounts and Eligible Inventory.** As to accounts of Borrower against which Borrower seeks A/R Advances, and as to inventory of Borrower as to which Borrower seeks Inventory Advances, such accounts shall be Eligible Accounts and such inventory shall be Eligible Inventory.

8. **Borrower's Affirmative Covenants.** Until payment in full of the Obligations and termination of all obligation of Lender to extend credit to Borrower hereunder, Borrower agrees for the benefit of Lender as set forth below.

8.1 **Financial Statements, Reports and Certifications.** Borrower will furnish to Lender, in form and scope satisfactory thereto:

8.1.1 **Annual Financial Statements.** As soon as possible after the end of each fiscal year of Borrower and in any event within ninety (90) days thereafter, (a) a complete copy of Borrower's financial statements, including (i) the management letter, if any, (ii) the balance sheet as of the close of the fiscal year, (iii) the income statement for such year and (iv) the statement of cash flows for such year, all reviewed by certified public accountants selected by Borrower and satisfactory to Lender, and (b) a statement certified by the chief financial officer or president of Borrower that Borrower is in compliance with all the terms, conditions, covenants, representations and warranties of this Agreement;

8.1.2 **Other Financial Statements.** Not later than sixty (60) days after the close of each fiscal quarter of Borrower (an "Accounting Period"), Borrower's balance sheet as of the close of

such Accounting Period and its income statement for that portion of the then current fiscal year through the end of such Accounting Period, certified by Borrower's chief financial officer or president as being complete and correct and fairly representing Borrower's financial condition and results of operations for such Accounting Period;

8.1.3 **Account Reports.**

8.1.3.1 At least weekly, or more frequently if Borrower so desires, such information concerning Borrower's accounts as Lender may request, including names and addresses of Account Debtors, sales journals, credit memos, debit memos and cash discounts;

8.1.3.2 On (a) the fifteenth day of each month and (b) the last day of each month, an accounts aging report as of such day, together with, in the case of the latter such report, a reconciliation of Borrower's records with Lender's; and

8.1.3.3 On or before the fifteenth day of each month, an accounts payable aging report, aged by invoice date, as of the last day of the preceding month;

8.1.4 **Inventory Reports.** On or before the last day of each month, a statement describing all inventory of Borrower as of such day, including the composition thereof; provided, however, that Borrower shall not be required to furnish any such statement if the Inventory Maximum Commitment is zero;

8.1.5 **Annual Inventory Appraisal.** If the Inventory Maximum Commitment exceeds $1,000,000.00, on or before each anniversary of the Initial Funding Date, an appraisal of the inventory, such appraisal to be prepared (a) by an appraiser acceptable to Lender, (b) in form and scope satisfactory to Lender and (c) as of a date within the 30 days immediately preceding such anniversary; provided, however, that Lender shall have the right to arrange for any such appraisal itself at any time and to charge Borrower for the same pursuant to Section 8.2.1.3;

8.1.6 **Annual Equipment Appraisal.** Upon Lender's request, on or before each anniversary of the date on which the Term Loan was made, an appraisal of the equipment whose purchase was financed or refinanced by the Term Loan, such appraisal to be prepared (a) by an appraiser acceptable to Lender, (b) in form and scope satisfactory to Lender and (c) as of a date within the 30 days immediately preceding such anniversary; provided, however, that Lender shall have the right to arrange for any such appraisal itself at any time and to charge Borrower for the same pursuant to Section 8.2.1.3;

8.1.7 **Legal Proceedings.** Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation, arbitrations, judicial reference proceedings and administrative proceedings to which Borrower or any Guarantor is a party or otherwise affecting Borrower or any Guarantor;

8.1.8 **Defaults.** Promptly upon the occurrence thereof, notice of any Event of Default, including any material adverse change in the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any Guarantor; and

8.1.9 **Other Information.** Promptly upon request by Lender, such other information concerning the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any Guarantor as Lender may from time to time request.

Lender shall be entitled to rely upon any financial statements, reports, certifications, appraisals, notices and other information provided to Lender under Section 8 or under any other provision of this Agreement or any of the other Documents, whether provided in original, by facsimile, electronically or otherwise, by anyone purporting to be an officer, employee or representative of Borrower or with access to Lender's website.

8.2 **Expenses.**

8.2.1 **Generally.** Promptly upon demand by Lender, Borrower will pay all reasonable out-of-pocket expenses of Lender (including fees and disbursements of Lender's counsel) incident to or arising from any of the following (whether or not in connection with any judicial or other dispute-resolution proceedings involving tort, contract or other claims):

8.2.1.1 the preparation, negotiation, execution, administration and enforcement of the Documents, any amendments, extensions and renewals thereof, and any other documents prepared in connection with any transactions between Borrower and Lender, whether or not executed;

8.2.1.2 any reasonable expenses incurred by Lender (whether or not for the benefit of Borrower) under this Agreement, including all expenses for postage relating to the mailing of statements, invoices and verifications and expenses for background checks and investigations of Borrower, any Guarantors and their respective shareholders, principals and Key Employees;

8.2.1.3 appraisals obtained by Lender pursuant to Section 8.1.5 and 8.1.6;

8.2.1.4 the protection of Lender's rights under the Documents;

8.2.1.5 defending against any and all claims against Lender relating to any of its acts of commission or omission directly or indirectly relating to the Documents, except those brought by Borrower or its affiliates; and/or

8.2.1.6 in any way arising out of a bankruptcy, reorganization or similar proceeding commenced by or against Borrower, including expenses incurred in enforcing or defending Lender's claims against Borrower or against any collateral granted to Lender under the Documents, in defending any avoidance actions and in administering or monitoring said proceeding.

8.2.2 **Indemnification.** Promptly upon demand by Lender, Borrower will indemnify Lender against, and save Lender harmless from, any and all liability with respect to any stamp or other taxes (other than income taxes) that may be determined to be payable in connection with the execution of the Documents or any action of Lender with respect to the collateral granted to Lender under the Documents, including the transfer of the collateral to Lender's name or that of Lender's nominee or any purchaser at a foreclosure sale.

8.2.3 **Audit Expenses.** Promptly upon demand by Lender, Borrower will reimburse Lender at the rate of $900 per person per day, together with all reasonable out-of-pocket expenses incurred, for all audits conducted by Lender with respect to all or any portion of the Collateral and/or Borrower's financial and other records; provided, however, that, so long as no Event of Default has occurred and is continuing, Borrower shall not be obligated to reimburse Lender for more than three such audits conducted in any calendar year. Such audits may be conducted by Lender from time to time in its sole discretion and may be handled by Lender's own personnel and/or by outside auditors engaged by Lender (and in either such case shall be reimbursed as specified above).

8.3 **Costs and Expenses - Enforcement of Judgments.** Promptly upon demand by Lender, Borrower will reimburse Lender for all reasonable costs and expenses, including attorneys' fees, that Lender incurs in enforcing any judgment rendered in connection with this Agreement or any of the other Documents. This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, any such judgment.

8.4 **Taxes and Expenses Regarding Borrower's Assets.** Borrower will make timely payment or deposit of all taxes, assessments and contributions required of Borrower. If Borrower fails to make any such payment or deposit or to furnish proof of the same to Lender promptly upon request thereby,

Lender may, in its sole discretion and without notice to Borrower, (a) make payment of all or any portion thereof or (b) set up such reserves against the A/R Allowable Amount as Lender deems necessary to satisfy the liability therefor, or both. Lender may conclusively rely on statements of the amount owing or other official statements issued by the appropriate governmental agency. No payment made by Lender shall constitute either (i) an agreement by Lender to make similar payments in the future or (ii) a waiver by Lender of any default under the Documents. Lender shall have no obligation to inquire into or contest the validity of any expense, tax or Lien, and the receipt of an official notice requiring the payment thereof shall be conclusive evidence that the same is validly due and owing.

8.5 **Location of Collateral.** Immediately upon forming an intention to change the location of its chief place of business or of any of the Collateral, Borrower will give Lender written notice of the same, and if Borrower is not the owner of such new location, Borrower (if required by Lender) shall cause Lender to receive from third party owners or lessors (as applicable) landlords' waivers, warehousemans' waivers and/or bailee waivers, in form acceptable to Lender.

8.6 **Change in Name, Etc.** Immediately upon forming an intention to change the jurisdiction where it is organized, its name or its form of business organization, Borrower will give Lender written notice of the same.

8.7 **Insurance**. Borrower will at all times maintain, with financially sound and reputable insurers, casualty insurance with respect to the Collateral and Borrower's other assets. All such insurance policies shall be in such form, substance, amounts and coverage as may be satisfactory to Lender and shall provide for thirty (30) days' prior written notice to Lender of cancellation or reduction of coverage. Borrower hereby irrevocably authorizes Lender and any designee of Lender to obtain at Borrower's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to, such insurance or to amend or cancel such insurance. Borrower will deliver to Lender evidence of such insurance and a lender's loss-payable endorsement naming Lender as loss payee, promptly upon demand by Lender as to all existing insurance policies relating to the Collateral and promptly upon obtaining such insurance as to all future insurance policies relating to the Collateral. Borrower will deliver to Lender in kind, promptly upon receipt thereof, all instruments representing proceeds of insurance received by Borrower. Lender may apply any and all insurance proceeds received at any time to the cost of repairs to or replacement of any portion of the Collateral and/or, at Lender's option, to the payment of or as security for any of the Obligations, whether or not due, in such manner and order as Lender may elect in its sole discretion.

8.8 **Further Assurances.** At any time and from time to time, at its own expense, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that Lender may reasonably request in order to perfect and protect the security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

8.9 **Bankruptcy Case Matters.**

8.9.1 Promptly shall furnish to counsel for Lender all judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or served upon the United States Trustee in the Bankruptcy Case or other non-confidential material documents distributed by or on behalf of Borrower to any Committee appointed in the Bankruptcy Case. Borrower shall promptly advise and provide reasonable access to, and discuss with, Lender and its counsel any and all material information and developments in connection with any proposed chapter 11 plan or asset sale pursuant to Section 363 of the Bankruptcy Code, any asset valuation and disclosure statement, and any other event or condition which is reasonably likely to have a material effect on Borrower or the Bankruptcy Case.

8.9.2 Borrower shall not incur, create, assume, suffer or permit any claim or lien or encumbrance against it or any of its property or assets in the Bankruptcy Case (other than the claims specifically referred to in the Financing Orders but only to the extent therein described) to be *pari passu* with or senior to the interest and claims of Lender against Borrower, or apply to the Bankruptcy Court for authority to do so.

8.9.3 All fees or expenses of Professionals at any time shall be paid pursuant to an order approving the allowance and payment of such fees and reimbursement of such expenses, or establishing procedures for such payments or approval of such fees and reimbursement.

8.9.4 Borrower shall not request, seek or consent to, and shall oppose and contest (unless otherwise consented to by Lender), any modification, stay, vacating of or amendment of any Financing Order or Documents.

8.9.5 Except as otherwise expressly provided by the Financing Orders, Borrower shall not seek or support any approval of the granting of any priority for any administrative expense, secured claim or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever) which is equal or superior to the priority in respect of the Obligations unless otherwise expressly consented to by Lender in writing.

8.9.6 Prior to the date on which the Obligations have been paid in full in cash and any commitment of Lender to provide loans or any other financial accommodation hereunder has been terminated, Borrower shall not pay any administrative priority expenses except for the allowed fees and expenses of Professionals as provided and otherwise not prohibited herein.

8.9.7 Borrower shall not make any payments or transfers of any property on account of claims asserted by any vendors of Borrower for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Court.

8.9.8 Upon and in the event of the termination of Lender's commitment to make loans or provide financial accommodations hereunder, Borrower shall not request or support any request for the use of Collateral or Cash Collateral pursuant to Section 363 of the Bankruptcy Code or other applicable law under any circumstance without Lender's further express, written consent.

8.9.9 In accordance with and to the extent permitted by the Financing Orders, Borrower hereby waives any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

9. **Borrower's Negative Covenant.** Until payment in full of the Obligations and termination of all obligation of Lender to extend credit hereunder, Borrower will not: (a) suffer to exist any Lien upon any of its assets, except for (i) Liens in favor of Lender, (ii) Liens in favor of Leaf Capital Funding, LLC, (iii) Liens in favor of U. S. Bank Equipment Finance, (iv) Liens in favor of Xerox Financial Services and (v) any purchase-money Lien on new equipment acquired by Borrower; (b) incur any indebtedness (including any guaranty of a third party's indebtedness) without Lender's prior written consent, except for (i) indebtedness secured by a purchase-money Lien on new equipment acquired by Borrower, and (ii) trade payables incurred in the ordinary course of business; (c) make any distributions or declare or pay any dividends on, or purchase, acquire, redeem or retire any of Borrower's stock (or other ownership interests) except as consented to in writing by Lender; (d) acquire any interest in, or make any loan to, or capital contribution to, any entity or individual; or (e) enter into any transactions with an affiliate of Borrower except for

transactions in the ordinary course of business consistent with past practices, that are disclosed to Lender, and that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliate.

10. **Events of Default and Remedies.**

10.1 **Events of Default.** Each of the following events or conditions shall constitute an "Event of Default":

10.1.1 Borrower defaults in the payment of any Obligation in respect of principal when due, whether at stated maturity, upon acceleration or otherwise; or Borrower defaults in the payment of any interest, fee or other Obligation when due, and in either case such default continues unremedied for three (3) business days;

10.1.2 any certification, representation or warranty to Lender in or in connection with any of the Documents is incorrect in any material respect when made;

10.1.3 any Obligor or Subordinated Creditor is in default with respect to any term, covenant or condition (other than any referred to in Section 10.1.1) contained in any of the Documents or in any other document, instrument, agreement or indebtedness entered into by such Obligor or Subordinated Creditor with or in favor of Lender and such default continues unremedied for three (3) business days;

10.1.4 the Obligations in respect of the A/R Advances at any time exceed the A/R Allowable Amount, or the Obligations in respect of the Inventory Advances at any time exceed the Inventory Allowable Amount, in either case unless such excess is caused by Lender's making of a Special Credit Accommodation to Borrower pursuant to Section 2.1.3;

10.1.5 any Obligor (a) fails to pay any indebtedness (other than any of the Obligations) when due or (b) is in default with respect to any term, covenant or condition contained in any document, instrument or agreement entered into in connection with any such indebtedness, in either case beyond any applicable grace period;

10.1.6 any Obligor fails to pay any payroll tax obligation when due;

10.1.7 an order for relief is entered against any Obligor by any United States Bankruptcy Court; any Obligor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h)); any Obligor makes an assignment for the benefit of creditors; any Obligor applies for or consents to the appointment of a custodian, receiver, trustee or similar officer for it or for any substantial part of its assets; any proceeding seeking the appointment of such a custodian, receiver, trustee or similar officer in respect of any Obligor is commenced without its application or consent, and such proceeding continues undischarged or unstayed for thirty (30) days or an order or decree approving or ordering such an appointment is entered; any Obligor institutes (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; any such proceeding is instituted (by petition, application or otherwise) against any Obligor, and such proceeding continues undismissed or unstayed for thirty (30) days or an order for relief is entered in any such proceeding; or any judgment, writ, warrant of attachment, execution or similar process is issued or levied against a material portion of the assets of any Obligor;

10.1.8 an adverse change occurs with respect to the financial condition or operations of Borrower, which change results in a material impairment, in the reasonable judgment of Lender, in the prospect of repayment of the Obligations;

10.1.9 a sale, hypothecation or other disposition is made of a beneficial interest in any class of voting stock of, or other equity interest in, Borrower, resulting in a change in control of Borrower without Lender's prior written consent;

10.1.10 any Document or any material provision thereof, at any time after execution and delivery of such Document and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of the Obligations, ceases to be in full force and effect; any Obligor or Subordinating Creditor contests in bad faith the validity or enforceability of any Document or any provision thereof; or any Obligor or Subordinating Creditor denies that it has any or further liability or obligation under any Document or purports to revoke, terminate or rescind any Document or any provision thereof;

10.1.11 except as permitted by Section 9 or as otherwise permitted by Lender in writing, any security agreement, pledge agreement, mortgage, deed of trust or other Document granting a security interest or other Lien in favor of Lender ceases to create for any reason (except pursuant to the terms thereof) a valid and perfected first-priority Lien on any of the collateral purported to be covered thereby;

10.1.12 any of the Key Employees fails to maintain a full-time working schedule (excluding normal vacations and holidays) in furtherance of the business affairs of Borrower for any 30-day period or ceases to be employed by Borrower and such vacancy is not filled by Borrower within 60 days with a person acceptable to Lender who has executed a Validity Indemnification with Lender;

10.1.13 loss, theft, destruction, or sale (other than sale of inventory in the ordinary course of business) of any collateral with respect to which Lender has been granted a security interest or other Lien under any Document;

10.1.14 Borrower liquidates, dissolves, terminates or suspends its business operations or otherwise fails to operate its business in the ordinary course, or sells all or substantially all of its assets, without Lender's prior written consent;

10.1.15 with respect to any of Borrower's premises leased from a party affiliated with Borrower in any manner (including as stockholder, owner, partner, member, officer, director, agent or employee), Borrower, without Lender's prior written consent, agrees to an increase in the monthly rent or other amounts payable under such lease arrangement; or

10.1.16 a judgment or other claim is entered against any Obligor or same results in a Lien upon any property of any Obligor and such Lien is not discharged or subordinated to Lender within a reasonable amount of time; Or

10.1.17 Bankruptcy Case Defaults. (a) the entry of an order in the Bankruptcy Case: authorizing Borrower in the Bankruptcy Case to incur indebtedness (except as expressly permitted under this Agreement such as the Permitted Borrowing) or additional financing under Section 364(c) or (d) of the Bankruptcy Code other than from Lender or without the express prior written consent of Lender; authorizing any party to recover from any material portions of the Collateral; authorizing any costs or expenses under Section 506(c) of the Bankruptcy Code as a surcharge against the Collateral; authorizing the use of Cash Collateral without Lender's prior written consent under Section 363(c) of the Bankruptcy Code (except as provided herein or in the Financing Orders); appointing an interim or permanent trustee, or an examiner having enlarged powers relating to the operation of the businesses of Borrower under Section 1106(b) of the Bankruptcy Code; dismissing the Bankruptcy Case, absent Lender's prior written consent, or converting the Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code; granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any party to execute upon or enforce a lien on or exercise any right with respect to any material portion of the Collateral or to the extent it would result in a material adverse effect on Borrower, Borrower's financial or operational condition, or Borrower's prospects; absent Lender's prior written consent, amending,

supplementing, staying, reversing, vacating or otherwise modifying any Financing Order, this Agreement or any other Document, or Lender's rights, benefits, privileges or remedies under the Financing Orders, this Agreement or any other Document; approving or allowing any other administrative expense claim (other than as specifically provided herein) having any priority over, or being pari passu with the administrative expense priority of the Obligations incurred after the Petition Date); (b) the Court shall fail to enter a Final Financing Order by May 30, 2025, or such later date agreed to by Lender; (c) the filing by Borrower of a chapter 11 plan that does not provide for the indefeasible payment (or cash collateralization in the case of contingent obligations) of all Obligations in full in cash on the effective date thereof or such other treatment consented to by Lender which may include continuing to provide financing approval of which is at Lender's discretion (d) the occurrence of any condition or event which permits Lender to exercise any of the remedies set forth in the Financing Orders, including, without limitation, any "Default" or "Event of Default", as defined in the Financing Orders; (e) the termination of the Financing Agreement as provided herein or in the Financing Orders; (f) Borrower suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business or if a trustee, receiver or custodian is appointed for any Borrower or any of its properties; or (g) any act, condition or event occurring after the date of the commencement of the Bankruptcy Cases that has a material adverse effect on Borrower or the Collateral or the rights and remedies of Lender under this Agreement or any other Financing Agreement, or otherwise causes a material adverse effect on Borrower, Borrower's financial or operational condition, or Borrower's prospects.

10.2 **Remedies.**

10.2.1 Upon the occurrence of any Event of Default (other than an Event of Default arising under Section 10.1.7), at Lender's option:

10.2.1.1 Lender may declare this Agreement and all of Lender's obligations hereunder to be immediately terminated and/or Lender may refuse to make any requested Advance, effective either immediately or at a future date;

10.2.1.2 Lender may declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower;

10.2.1.3 the Obligations may accrue interest as provided in Section 3.2.2; and/or

10.2.1.4 Lender may enforce payment of all Obligations and exercise any and all other rights and remedies granted to it under the Documents, at law, in equity or otherwise.

10.2.2 Upon the occurrence of any Event of Default arising under Section 10.1.7:

10.2.2.1 this Agreement and all of Lender's obligations hereunder shall automatically terminate and/or Lender may refuse to make any requested Advances;

10.2.2.2 all Obligations shall be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by Borrower;

10.2.2.3 all Obligations shall accrue interest as provided in Section 3.2.2; and/or

10.2.2.4 Lender may enforce payment of all Obligations and exercise any and all other rights and remedies granted to it under the Documents, at law, in equity or otherwise.

10.2.3 In addition to the foregoing remedies, upon the occurrence of any Event of Default, Lender may (a) require Borrower to, and Borrower hereby agrees that it will at its expense and upon request by Lender forthwith, assemble all or part of the Collateral as directed by Lender and make it available to Lender at a place to be designated by Lender that is reasonably convenient to both parties and (b) without notice except as required by applicable law, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Lender deems commercially reasonable. Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

10.2.4 All cash held by Lender as Collateral and all cash proceeds received by Lender in respect of any sale of, collection from or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as collateral for, and/or then or at any time thereafter applied against, all or any part of the Obligations in such manner and order as Lender may elect in its sole discretion. Any surplus of such cash or cash proceeds held by Lender and remaining after payment in full of the Obligations shall be paid over to Borrower or to whoever may be lawfully entitled to receive such surplus.

11. **Termination.** The Revolving Credit Facility shall continue in effect until the first Anniversary Date and shall thereafter be automatically renewed successively to the next Anniversary Date, subject to the terms of this Agreement, unless:

11.1 Lender gives Borrower notice of termination, in which event the Revolving Credit Facility shall terminate sixty (60) days after the date of such notice; or

11.2 Borrower gives Lender notice of nonrenewal, in which event the Revolving Credit Facility shall terminate on the next Anniversary Date that is at least sixty (60) days after the date on which such notice of termination is actually received by Lender; or

11.3 Borrower gives Lender notice of termination pursuant any proviso set forth at the end of Section 3.3.9, in which event the Revolving Credit Facility shall terminate on the termination date set forth in such notice that is at least sixty (60) days after the date on which such notice of termination is actually received by Lender.

In the event Borrower finally repays the Obligations prior to the expiration of the termination date set forth in the applicable notice provided pursuant to Section 11.2 or 11.3, Borrower shall pay Lender a fee in an amount equal to the product of (a) the average daily interest, administrative fees and other amounts incurred under this Agreement during the ninety (90) period prior to such final repayment, times (b) an amount equal to the difference between (i) sixty (60), and (ii) the amount of days elapsed from such applicable notice and Borrower's final repayment of the Obligations (but only so long as the amount in this subsection (b) is a positive amount).

11.4 This Agreement shall only become effective upon execution and delivery by Borrower and Lender and shall continue in full force and effect until the earlier of: (1) indefeasible satisfaction of all (or cash collateralization in the case of contingent obligations) Obligations in full and the termination of Lender's commitment to provide loans or financial accommodations hereunder; (2) automatic termination upon the occurrence of an Event of Default (after the expiration of any applicable cure or notice periods); or (3) such earlier date of termination as provided for in this Agreement.

12. **Revocation of Borrower's Right to Sell Inventory Free and Clear of Lender's Security Interest.** Lender may, upon the occurrence of an Event of Default, (a) revoke Borrower's right to sell

inventory free and clear of Lender's security interest therein and (b) notify Borrower's Account Debtors, or any other parties, of such revocation.

13. **No Lien Termination Without Release.** Notwithstanding the payment in full of all Obligations by Borrower, Lender shall not be required to record any terminations or satisfactions of any of its Liens on the Collateral unless and until Borrower and all Guarantors have executed and delivered to Lender general releases that conform to California Civil Code Sections 1541 and 1542.

14. **Indemnification.** Borrower hereby agrees to indemnify and hold harmless Lender and each of its officers, directors, employees, agents, advisors and affiliates (each an "Indemnified Person") from and against any and all claims, damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, whether or not such Indemnified Person is named as a party to any proceeding or is otherwise subjected to judicial or legal process arising from any such proceeding) that any of them may incur, or that may be claimed, asserted or awarded against any of them by any Person, in each case arising out of, related to or in connection with, or in connection with the preparation for a defense of any investigation, litigation or proceeding arising out of, related to or in connection with, any Document, any Credit Accommodation, the consummation of any transaction contemplated hereby or thereby, the use by Borrower of any Credit Accommodation or any activity contrary to the provisions of any law relating to the environment or any hazardous material, except to the extent that any such claim, damage, loss, liability, cost or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. The foregoing indemnity and hold harmless agreement by Borrower in favor of Lender shall survive termination of this Agreement and payment and performance of the Obligations, and continue thereafter.

15. **Limitation of Liability.** Lender shall not be liable or responsible for (a) any claims, demands, losses or damages made, claimed or suffered by Borrower (including any arising from Borrower's use of e-mail, Lender's website or other electronic means to send financial and other information to Lender, to request Credit Accommodations or otherwise), except such as may arise through or be caused by Lender's gross negligence or willful misconduct, or (b) any lost profits of Borrower arising from any breach of contract, any tort (excluding any arising from Lender's gross negligence or willful misconduct) or any other wrong arising from the establishment, administration or collection of the Obligations.

16. **Account Stated.** Lender may from time to time make available to Borrower statements concerning the transactions arising hereunder, including with respect to Credit Accommodations outstanding, payments of principal and interest in respect of Credit Accommodations, ineligible accounts and availability of Credit Accommodations. Each such statement, whether made available by Lender in writing or by posting on its website (which method of availability shall be determined by Lender in its sole discretion), shall be considered correct and binding upon Borrower as an account stated except to the extent that Lender receives, within thirty (30) days after the sending or posting of such statement, written notice from Borrower of any specific exceptions by Borrower to that statement.

17. **Retention of Records.** Lender will retain any documents, schedules, invoices or other papers delivered by Borrower only for such period as Lender, in its sole discretion, may determine necessary, after which time Lender may destroy such records without notice to or consent from Borrower.

18. **Notices to Third Parties.** Upon the occurrence of an Event of Default, Lender shall have the right to give any Guarantor or Subordinating Creditor notice of any fact or event relating to this Agreement, as Lender may deem necessary or desirable in Lender's sole discretion, including Borrower's financial condition.

19. **Information to Participants.** Lender may furnish any financial or other information concerning Borrower or any of its subsidiaries, whether provided by Borrower to Lender pursuant to this Agreement or otherwise, to (a) any prospective or actual purchaser of any participation or other interest in any extensions of credit made by Lender to Borrower (whether under this Agreement or otherwise), (b) any prospective purchaser of any securities issued or to be issued by Lender and/or (c) any prospective lender to Lender.

20. **Entire Agreement.** This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof. No course of prior dealings between the parties, no usage of trade, and no parol or extrinsic evidence of any nature, shall be used or be relevant to supplement, explain or modify any term used herein. In the event of any conflict between a term or condition of this Agreement and a term or condition of any document(s) executed in connection herewith, the term or condition of this Agreement shall govern. This Agreement has been fully reviewed and negotiated between the parties, and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Lender or Borrower under any rule of construction or otherwise.

21. **Miscellaneous.**

21.1 **Notices.** All notices and other communications required or permitted to be given to any Person under this Agreement shall be in writing and delivered in person or by electronic mail, courier or certified mail, postage prepaid and return-receipt requested, to the intended recipient at the applicable (physical or electronic mail) address specified below or at such other (physical or electronic mail) address as such Person may hereafter specify in writing pursuant to this section:

<u>Borrower</u>

Buffalo Newspress Inc.
200 Broadway Street
Buffalo, NY 14204
Telephone Number: (716) 852-2600
E-mail Address: t.majerski@printbnp.cpm
Attention: Thomas J. Majerski, President

–and –

Kevin Lelonek, Esq.
Gross Shuman PC
465 Main St., Suite 600
Buffalo, NY 14203
(716) 854-4300 Phone
(716) 854-2787 Fax
klelonek@gross-shuman.com

<u>Lender</u>

Celtic Capital Corporation
23622 Calabasas Rd., Suite 323
Calabasas, CA 91302
Telephone Number: (310) 314-7333
E-Mail Address: mhafner@celticcapital.com
Attention: Mark Hafner, President and CEO

-and-

Levinson Arshonsky Kurtz & Komsky, LLP
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Attn: Alexandra Rhim
(818) 817-2434 Phone
(818) 382-3433 Fax
arhim@lakklawyers.com

Each such notice or other communication shall be deemed to have been given (a) on the date of delivery in the case of personal delivery or e-mail communication prior to 5:00 p.m. Pacific Time or (b) on the delivery or refusal date specified on the return receipt in the case of certified mail or on the tracking report in the case of delivery by courier.

21.2 **Survival.** All representations, warranties and agreements of Borrower herein shall survive the extension of Credit Accommodations hereunder, and all such representations, warranties and agreements shall be effective so long as any obligations owed to Lender by Borrower remain unsatisfied or for such longer periods as may be expressly stated.

21.3 **Amendment and Waiver.** Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

21.4 **No Waiver.** No failure to exercise or delay in exercising any right, power or remedy of Lender shall impair any right, power or remedy that Lender may have; no such delay shall be construed to be a waiver of any of such right, power or remedy or an acquiescence in any breach or default hereunder; and no waiver of any breach or default of Borrower hereunder shall be deemed a waiver of any breach or default subsequently occurring. All rights and remedies granted to Lender hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Lender might otherwise have. Any waiver, permission, consent or approval by Lender of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

**21.5 GOVERNING LAW. ALL ISSUES ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA.**

21.6 **Waiver of Statute of Limitations.** Borrower waives the pleading of any statute of limitations with respect to any and all actions in connection herewith.

21.7 **Binding Effect.** This Agreement and the other Documents shall be binding upon, and shall inure to the benefit of, Borrower and Lender and their respective successors and assigns, except that Borrower may not assign any right or obligation hereunder or thereunder without the prior written consent of Lender, which consent may be granted or withheld by Lender in its sole discretion. Lender shall have the right to assign its rights and obligations under this Agreement and the other Documents, and to grant participations herein and therein, in whole or in part, without the consent of Borrower.

21.8 **Alternative Dispute Resolution.**

21.8.1 **Claims Subject to Judicial Reference; Selection of Referee.** All Claims, including any and all questions of law or fact relating thereto, shall, at the written request of Borrower or Lender (together the "Parties"), be determined by Reference. The Parties shall select a single neutral referee, who shall be a retired state- or federal-court judge with at least 5 years of judicial experience in civil matters. In the event that the Parties cannot agree upon a referee, the referee shall be appointed by a court having jurisdiction over the same. Borrower and Lender shall bear equally the fees and expenses of the referee unless the referee provides otherwise in the statement of decision.

21.8.2 **Conduct of Reference.** Except as otherwise provided in this Section 21.8, any Reference shall be conducted pursuant to Sections 638 through 645.1 of the California Code of Civil Procedure. The referee shall determine all issues relating to the applicability, interpretation, legality and enforceability of this Agreement and the other Documents.

21.8.3 **Provisional Remedies, Self-Help and Foreclosure.** No provision of this Section 21.8 shall limit the right of any Party (a) to exercise self-help remedies (including setoff), (b) to foreclose against or sell any collateral, by power of sale or otherwise, or (c) to obtain or oppose provisional or ancillary remedies from a court of competent jurisdiction before, after or during the pendency of a Reference. The exercise of, or opposition to, any such remedy does not waive the right of any Party to Reference pursuant to this Section 21.8.

21.8.4 **Limitation on Damages.** In the event that punitive damages are permitted under the law of the State of California, the amount thereof shall not exceed a sum equal to three times the amount of actual damages as determined by the referee.

21.8.5 **Severability.** In the event that any provision of any Document is found to be illegal or unenforceable, the remainder of such Document shall remain in full force and effect.

21.8.6 **Miscellaneous.** In the event that multiple claims are asserted, some of which are found not subject to the provisions of this Section 21.8, the Parties agree to stay the proceedings of the claims not subject to this Section 21.8 until all other claims are resolved in accordance with this Section 21.8. In the event that claims are asserted against multiple parties, some of which are not subject to this Section 21.8, the Parties agree to sever the claims subject to this Section 21.8 and resolve them in accordance with this Section 21.8. In the event of any challenge to the legality or enforceability of this Section 21.8, the prevailing Party shall be entitled to recover the costs and expenses, including reasonable attorneys' fees, incurred by it in connection therewith.

21.8.7 **WAIVER OF JURY TRIAL.** IN CONNECTION WITH ANY REFERENCE OR ANY OTHER ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER BROUGHT IN STATE OR FEDERAL COURT, BORROWER AND LENDER HEREBY EXPRESSLY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY RIGHT THEY MAY OTHERWISE HAVE TO TRIAL BY JURY OF ANY CLAIM.

21.9 **Venue**. Borrower and Lender hereby agree that (a) this Agreement and the Documents are entered into, and that Borrower's performance thereunder occurs, at Lender's location within the County of Los Angeles, State of California; and (b) any Reference or any other action, proceeding or counterclaim arising out of or relating to this Agreement or the Documents or the interpretation, performance or breach of this Agreement or the Documents shall be instituted in the United States District Court for the Central District of California, or any court of the State of California, located in Los Angeles County, California, and Borrower and Lender irrevocably submit to the jurisdiction of those courts and waive any and all objections to jurisdiction or venue that it may have under the laws of the State of California or other applicable law, provided, however, that any action or proceeding seeking enforcement against any Collateral or other property may be brought, at Lender's option, in the courts of any jurisdiction where Lender elects to bring such action or proceeding or where such Collateral or other property may be found; and the parties agree that all actions or proceedings arising in connection with the DIP Financing shall be tried and litigated only in the Bankruptcy Court.

21.9 **Counterparts; Electronic Signatures.** This Agreement and any of the Documents may be signed in any number of counterparts with the same effect as if all signatures were upon the same instrument. This Agreement and any of the Documents, or a signature page thereto intended to be attached to a copy of this Agreement or any of the Documents, signed and transmitted by facsimile machine, telecopier, or other electronic means (including via transmittal of an e-mail or a "pdf" file) shall be deemed and treated as an original document. The signature of any person thereon, for purposes hereof, is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document.

21.10 **Reinstatement of Obligations.** If the incurrence or payment of the Obligations by Borrower or any of the Guarantors or the transfer by any of them to Lender of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to

creditor's rights, including provisions of the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended, and any successor statute relating to fraudulent conveyances, preferences, and other voidable or recoverable payments or money or transfers or property (collectively, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice or its counsel, then, as to any such Voidable Transfer or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrower or such Guarantors automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made. The foregoing agreement by Borrower and Guarantors in favor of Lender shall survive termination of this Agreement and payment and performance of the Obligations, and continue thereafter.

21.11 **ACKNOWLEDGEMENT OF PREPETITION OBLIGATIONS.** As of the Petition Date, (i) the Prepetition Obligations were due and outstanding pursuant to the Prepetition Financing Agreements in the principal amount of not less than approximately $1,003,389.93 plus accrued interest, fees, costs and charges, including without limitation, reasonable attorneys' fees, in the aggregate, all of which Prepetition Obligations are unconditionally owing by Borrower to Prepetition Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever; (ii) Borrower does not have any defense to, set off, counterclaim or other basis to challenge the Prepetition Obligations; (iii) the Prepetition Obligations are secured by valid perfected liens on all of the Prepetition Collateral; (iv) the Prepetition Liens encumbering the Prepetition Collateral are not avoidable in any way, including without limitation, by operation of any section of the Bankruptcy Code, including without limitation sections 541-550 of the Bankruptcy Code or any other law; (v) the Prepetition Obligations and the Prepetition Liens are not subject to subordination in favor of any other person on any basis except as specifically provided in the Prepetition Agreement.

21.13 **ASSUMPTION AND RESTATEMENT.** Effective as of the date hereof, Borrower hereby agrees to become a borrower, debtor, and obligor under, and to bind itself to, the Prepetition Financing Agreements to which Borrower is bound generally (in each case, as modified and restated hereby), and, in such capacity, to assume and bind itself to all Obligations of Borrower thereunder (as modified and restated hereby). The terms, conditions, agreements, covenants, representations and warranties set forth in and relating to the Prepetition Agreement are hereby amended and restated in their entirety, and as so amended and restated, replaced and superseded, by the terms, conditions, agreements, covenants, representations and warranties set forth in this Agreement. This Agreement does not extinguish the obligations, including, without limitation, obligations for the payment of money outstanding under the Prepetition Agreement or discharge or release the obligations or the liens or priority of any mortgage, pledge, security agreement or any other security therefor, which shall continue, as modified and restated hereby, without interruption and in full force and effect. Nothing herein contained shall be construed as a substitution or novation of the obligations outstanding under the Prepetition Agreement or instruments securing the same, which shall remain in full force and effect, except as modified hereby or by instruments executed concurrently herewith. Nothing expressed or implied in this Agreement shall be construed as a release or other discharge of any Borrower or Obligor from any of their obligations or liabilities under the Prepetition Financing Agreements or any of the security agreements, pledge agreements, mortgages, guaranties or other loan documents executed in connection therewith. Borrower hereby ratifies, assumes, adopts, confirms and agrees that (i) the Prepetition Financing Agreements to which it is a party are, and shall continue to be, in full force and effect and are hereby ratified and confirmed in all respects; and (ii) to the extent that any such Prepetition Financing Agreement purports to assign or pledge to Lender a security interest in or lien on, any Collateral as security for the Obligations existing in respect of the Prepetition Agreement, such pledge, assignment or grant of the security interest or lien is hereby ratified and confirmed in all respects in favor of Lender in connection with this Amendment and the Documents to secure the Obligations.

22. **Effect of Amendment and Restatement.**

22.1 On and after the effective date of this Agreement, each reference, if any, in the other Documents to the Prior Agreement shall mean and be a reference to this Agreement. Except for those

Documents being amended and restated contemporaneously herewith, all of the other Documents shall remain in full force and effect and are hereby ratified and confirmed.

22.2 The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under any of the Documents or constitute a waiver of any provision of any of the Documents.

22.3 On and after the effective date hereof, this Agreement shall supersede the Prior Agreement in its entirety.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first written above.

**BUFFALO NEWSPRESS INC.**

By: ______________________________
Name: Thomas J. Majerski
Title: President

**CELTIC CAPITAL CORPORATION**

By: ______________________________
Alexander P. Falo
Executive Vice President

EXHIBIT A

Dear Valued Customer:

In connection with our continued commitment to serving the needs of our customers, we have implemented new internal control policies and procedures. One of these procedures has led to our contracting with an outside firm to perform random verification of our accounts receivable to ensure timely compliance with the terms and conditions of our agreements/purchase orders with you. We want to make sure we are meeting all of your expectations and if not, we can quickly make corrections.

To that end, please expect to get occasional calls from this outside firm, Gibson Cooper. Feel free to disclose/confirm any information regarding our relationship with you to them, to include:

- Verification of open invoices
- Receipt of shipments/services provided to you by us
- Disclosure of any problems associated with the invoices in question to include: disputes (pricing or otherwise), returns and offsets to the invoice of any kind
- Confirmation of payment terms
- Status of the invoice (approved, set up for payment, etc.)

We intend this new procedure to help us serve you better in the future and to help our company build on its past successes to achieve our growth goals.

If you have any questions, please do not hesitate to contact me directly at 716-277-0001 or email me at c.rosati@printbnp.com.

Regards,

Carl A. Rosati, III, CPA
VP – Finance and Administration

# EXHIBIT B

Re: Buffalo Newspress Inc. (the "Client")

Ladies and Gentlemen:

We are pleased to inform you that, to enable the Client to better service its customers, the Client has assigned its present and future accounts receivable to Celtic Capital Corporation.

To the extent that you are now indebted to the Client or may in the future become indebted to the Client, payment of such indebtedness is to be made to Celtic Capital and not to the Client or any other person or entity. Please note that pursuant to applicable law (including Uniform Commercial Code Section 9-406) payment to any other party other than Lender will not constitute satisfaction of the applicable indebtedness. The payments should be sent in electronic form to Celtic Capital at the following bank account:

Celtic Capital Corporation
c/o Buffalo Newspress Inc.
Northwest Bank
100 Liberty Street
Warren, PA 16365
Account #: [redacted]
ABA #: [redacted]

If payments are made via credit card, please continue to pay as usual.

Or a check mailed to the following street address:

Celtic Capital Corporation
23622 Calabasas Rd., Suite 323
Calabasas, CA 91302

The payment instructions contained in this letter may be revoked only in writing, signed by an officer of Celtic Capital and acknowledged before a notary public.

Please let us at Celtic Capital Corporation know if you have any questions concerning this matter. We thank you in advance for continuing your fine payment record.

Very truly yours,

CELTIC CAPITAL CORPORATION

______________________________
Alexander P. Falo
Executive Vice President

Authorized and agreed to:

BUFFALO NEWSPRESS INC.

______________________________
Thomas J. Majerski
President

EXHIBIT C

Mr. Brian Kern
Lumsden McCormick CPA
369 Franklin Street
Buffalo, NY 14202

Dear Brian:

We hereby instruct you to:

(1) send to Celtic Capital Corporation ("Lender") (a) all financial statements prepared by your office on our behalf, whether such financial statements are preliminary or final, (b) all tax returns prepared by your office on our behalf, and (c) all reports prepared by your office as a result of any audit or other review of our operations, finances or internal controls, including any reports dealing with improper accounting practices, defalcations, financial reporting errors or misstatements, or fraud perpetrated on or by us or by any of our employees or agents;

(2) upon Lender's request, meet with representatives of Lender (a) to discuss the financial information described in paragraph (1) above, (b) to answer any questions regarding the same and (c) to make available to Lender any of the books and records concerning us that may be in your possession.

Please be advised that one of the principal purposes of the [reviewed] financial statements that you may be asked to prepare is to provide Lender with information regarding our financial condition.

All of the financial information described above must be sent to Lender prior to or simultaneously with its being sent to us.

These instructions may be revoked only by a writing signed by an officer of Lender and acknowledged before a notary public.

Thank you.

Very truly yours,

BUFFALO NEWSPRESS INC.

By: ______________________________
Thomas J. Majerski
President

cc: Celtic Capital Corporation

EXHIBIT D

**AMENDED AND RESTATED TERM NOTE**

$411,671.94 May __, 2025

FOR VALUE RECEIVED, the undersigned BUFFALO NEWSPRESS INC., a New York corporation, and each other signer of this Note (the undersigned and each such other signer collectively called "Borrower"), jointly and severally promise to pay to the order of CELTIC CAPITAL CORPORATION ("Lender"), at its office at 23622 Calabasas Rd., Suite 323, Calabasas, CA 91302 or at such other place as Lender may designate in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of four hundred eleven thousand six hundred seventy one dollars and ninety four cents ($411,671.94) (the "Term Loan"), with interest thereon from the date on which the Term Loan is disbursed until maturity, at the Term Loan Interest Rate. Terms defined in the Loan Agreement and not otherwise defined herein have the same respective meanings when used herein.

Interest on the Term Loan shall be payable in arrears on the first day of each calendar month, commencing on June 1, 2025, and on the date on which the Term Loan is paid in full. Principal of the Term Loan shall be payable in 41 consecutive installments as follows: (1) 40 installments of $10,182.67 each, payable on the 15th day of each calendar month, commencing on June 15, 2025 and ending on September 15, 2028; and (2) a final installment equal to the entire unpaid principal balance of the Term Loan, payable on October 15, 2028; provided, however, that the entire unpaid principal amount of the Term Loan shall in any event be due and payable on the Termination Date, together with all accrued and unpaid interest thereon.

Any unpaid payments of principal or interest on this Note shall bear additional charges as set forth in the Loan Agreement.

This Note is the "Term Note" referred to in the Amended and Restated Loan and Security Agreement dated as of May _, 2025 (as amended from time to time, the "Loan Agreement") between Borrower and Lender and is governed by the terms thereof. The Loan Agreement, among other things, (1) provides for the making of the Term Loan by Lender to Borrower in an aggregate amount not to exceed the dollar amount first set forth above, the indebtedness of Borrower resulting from the Term Loan being evidenced by this Note, and (2) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof before the maturity hereof upon the terms and conditions specified therein. The obligations of Borrower under this Note, and the other obligations of Borrower under the Documents, are secured by the Collateral as provided in the Documents.

Borrower hereby waives presentment, demand, protest and notice of any kind. No failure to exercise, or delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of any such rights.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA.

BUFFALO NEWSPRESS INC.

By: ______________________
Name: Thomas J. Majerski____
Title: __President__________

Doc #1257665.5

# EXHIBIT B

## DIP Facility Summary

The following is a summary of the key terms of the DIP Facility as set forth in the Loan and Security Agreement, as modified by the postpetition amendment (collectively, the "LSA").

| | |
|---|---|
| The following loans are available subject to terms and conditions: | **Revolving Loans: $2,500,000** is the maximum amount of loans available based on eligible accounts receivable. The DIP Facility expanded the criteria for eligible accounts receivable resulting in greater loan availability<br><br>**Inventory Loans: $500,000** is the maximum amount of loans available based on inventory. The DIP Facility expanded the criteria for availability under this line. |
| (Variable) Interest Rate: | 7% above Index Rate. (Index Rate is determined based on SOFR (secured overnight financing rate) with a monthly tenor.)<br><br>Current Interest Rate is 11.30% [based on 7% above the Index Rate which is currently 4.30%]. |
| Collateral: | All of debtor's personal property assets, including but not limited to accounts receivable, deposit accounts, cash and cash equivalents, goods, inventory, equipment, fixtures, investment property, books and records, insurance policies, general intangibles and proceeds of any of the foregoing. [LSA at § 1.20.7]<br><br>The collateral does not include Avoidance Actions and debtor's real property. [LSA at § 1.20.7] |
| Maturity Date/Anniversary Date | The anniversary date has been extended to July 18, 2026 subject to automatic annual renewal absent termination by lender or debtor. |

# EXHIBIT “3”

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

---

In Re

BUFFALO NEWSPRESS INC. d/b/a
BNP EMPOWERED PRINT

Debtor

Case No. 25-10125-CLB

Chapter 11

---

**ORDER: (1) APPROVING STIPULATION RE RELIEF FROM AUTOMATIC STAY; AND (2) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(1) AND (d)(2)**

Celtic Capital Corporation ("Celtic") having filed a motion for entry of an order: (1) approving the stipulation for relief from the automatic stay entered into with the debtor (the "Stipulation"); and (2) granting relief from the automatic stay pursuant to 11 U.S.C. § 362 (the "Motion") which was heard on August 10, 2026 and no opposition was made thereto, it is hereby:

ORDERED, that the Motion is granted pursuant to 11 U.S.C. § 362(d)(1) and (d)(2);

FURTHER ORDERED that as to Celtic, its successors, transferees and assigns, the stay under 11 11 U.S.C. § 362(a) is terminated to permit Celtic to enforce its rights and remedies against the debtor's personal property assets (including but not limited to accounts receivable, equipment, inventory, related items and proceeds thereof) consisting of Celtic's collateral;

FURTHER ORDERED that the 14-day stay provided by FRBP 4001(a)(3) is waived; and

FURTHER ORDERED that this order is binding and effective despite a conversion to a case under any other chapter of the Bankruptcy Code.

Dated: Buffalo, New York

August 11, 2026

CARL L. BUCKI
UNITED STATES BANKRUPTCY JUDGE

FILED
AUG 11 2026
BANKRUPTCY COURT
BUFFALO, NY

# EXHIBIT “4”

| Inv Date | Due Date | Invoice | Invoice Amount | Current | > 30 | > 60 | > 90 | > 120 | Total | Days |
|---|---|---|---|---|---|---|---|---|---|---|
| **LEEENT - Lee Enterprises, Inc.** | | **Terms: Net 45** | **Account Manager: Thomas Warren** | | | | | | | |
| **Email: apbuffalo@bhmginc.com** | | | | | | | | | | |
| 6/2/26 | 7/17/26 | 25233 | 3,858.31 | 0.00 | 0.00 | 3,858.31 | 0.00 | 0.00 | 3,858.31 | -33 |
| 6/12/26 | 7/27/26 | 25273 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | -23 |
| 6/12/26 | 7/27/26 | 25279 | 5,567.14 | 0.00 | 0.00 | 5,567.14 | 0.00 | 0.00 | 5,567.14 | -23 |
| 6/17/26 | 8/1/26 | 25295 | 1,371.97 | 0.00 | 0.00 | 1,371.97 | 0.00 | 0.00 | 1,371.97 | -18 |
| 6/17/26 | 8/1/26 | 25316 | 4,706.10 | 0.00 | 0.00 | 4,706.10 | 0.00 | 0.00 | 4,706.10 | -18 |
| 6/19/26 | 8/3/26 | 25294 | 1,077.76 | 0.00 | 0.00 | 1,077.76 | 0.00 | 0.00 | 1,077.76 | -16 |
| 6/19/26 | 8/3/26 | 25298 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | -16 |
| 6/19/26 | 8/3/26 | 25307 | 7,934.96 | 0.00 | 0.00 | 7,934.96 | 0.00 | 0.00 | 7,934.96 | -16 |
| 6/19/26 | 8/3/26 | 25308 | 20,717.41 | 0.00 | 0.00 | 20,717.41 | 0.00 | 0.00 | 20,717.41 | -16 |
| 6/23/26 | 8/7/26 | 25319 | 1,483.42 | 0.00 | 1,483.42 | 0.00 | 0.00 | 0.00 | 1,483.42 | -12 |
| 6/23/26 | 8/7/26 | 25320 | 3,972.33 | 0.00 | 3,972.33 | 0.00 | 0.00 | 0.00 | 3,972.33 | -12 |
| 6/26/26 | 8/10/26 | 25321 | 25,863.36 | 0.00 | 25,863.36 | 0.00 | 0.00 | 0.00 | 25,863.36 | -9 |
| 6/26/26 | 8/10/26 | 25323 | 10,351.74 | 0.00 | 10,351.74 | 0.00 | 0.00 | 0.00 | 10,351.74 | -9 |
| 7/1/26 | 8/15/26 | 25346 | 1,371.97 | 0.00 | 1,371.97 | 0.00 | 0.00 | 0.00 | 1,371.97 | -4 |
| 7/10/26 | 8/24/26 | K25008 | 9,685.17 | 0.00 | 9,685.17 | 0.00 | 0.00 | 0.00 | 9,685.17 | 5 |
| 7/10/26 | 8/24/26 | T27001 | 23,494.86 | 0.00 | 23,494.86 | 0.00 | 0.00 | 0.00 | 23,494.86 | 5 |
| 7/10/26 | 8/24/26 | T27002 | 1,371.97 | 0.00 | 1,371.97 | 0.00 | 0.00 | 0.00 | 1,371.97 | 5 |
| 7/16/26 | 8/30/26 | T27006 | 21,932.46 | 0.00 | 21,932.46 | 0.00 | 0.00 | 0.00 | 21,932.46 | 11 |
| | | **Customer ID Sub-Total:** | **165,627.43** | **0.00** | **99,527.28** | **66,100.15** | **0.00** | **0.00** | **165,627.43** | |
| | | | | | **60 %** | **40 %** | | | | |

# EXHIBIT “5”

LEVINSON ARSHONSKY & KOMSKY, LLP
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
TELEPHONE (818) 382-3434
FACSIMILE (818) 382-3433
www.lakklawyers.com

WRITER'S DIRECT CONTACT
(818) 817-2434
arhim@laklawyers.com

August 19, 2026

**<u>VIA EMAIL</u>**
[steve.poulos@lee.net]

Lee Enterprises, Inc.
Attn: Steve Poulos
Mail Stop 105
PO Box 25219
Richmond, VA 23260

Re: Buffalo Newspress Inc. dba BNP Empowered Print ("<u>Borrower</u>")
***<u>Notice and Direction by Celtic Capital Corporation for Payment on Invoices</u>***

Dear Sir or Madam:

We have been retained by Celtic Capital Corporation ("Celtic") in connection with unpaid invoices issued by Borrower to your company. Please be advised that as of August 19, 2026, the unpaid amounts total $165,627.43 as delineated in Exhibit 1 appended hereto.

Celtic is the lender to Borrower and holds a security interest in Borrower's assets including accounts, accounts receivable, payment intangibles and proceeds thereof. Reference is made to the enclosed Notice of Assignment ("Notice of Assignment") which advises that all invoices were assigned to Celtic and instructs all amounts payable thereon to be paid directly and only to Celtic and no other party. The Notice of Assignment is appended as Exhibit 2.

Under California Commercial Code § 9607(1)-(3), Celtic is entitled to notify your company to make payment to Celtic, to accept and apply payment made, and enforce Borrower's rights with respect to obligations owed by your company.

Borrower is in default under its obligations to Celtic. Accordingly, Celtic is exercising its rights with respect to Borrower's accounts receivable as permitted by California Commercial Code § 9607(1)-(3) as explained above. This notice constitutes a direction to make payment to Celtic and that Celtic is exercising its rights to enforce Borrower's rights against accounts debtors. Please

also be advised that you should not make payment to Borrower or any other party and, by doing so, you will continue to remain liable for Celtic.

Celtic has sought and obtained authority from the Bankruptcy Court to receive payments from account debtors. On August 11, 2026, the Bankruptcy Court issued an order authorizing Celtic to collect all accounts receivable. That order is enclosed herewith as Exhibit 3 and provides as follows (emphasis added):

> FURTHER ORDERED that as to Celtic, its successors, transferees and assigns, the stay under 11 11 U.S.C. § 362(a) is terminated to **permit Celtic to enforce its rights and remedies against the debtor's personal property assets (including but not limited to accounts receivable**, equipment, inventory, related items and proceeds thereof) consisting of Celtic's collateral

On or about September 29, 2025, the Bankruptcy Court also issued an order authorizing Celtic to receive and apply collections:

> Application of Payments. The DIP Lender shall apply any and all proceeds of the Collateral, including Cash Collateral, or any other payments or consideration received by Lender in accordance with the DIP Loan Documents, which includes the application of Collateral first to Prepetition Obligations until the Prepetition Obligations are paid and satisfied in full, and then to the DIP Obligations.

Celtic is clearly entitled to receive payments on invoices and authorized to do so by the Bankruptcy Court. Accordingly, we request that all payments be made by August 28, 2026 in accordance with the instructions set out in the Notice of Assignment. If payment is not timely received, Celtic will have to commence suit and also seek to recover its fees and costs.

Celtic seeks an amicable resolution and looks forward to receiving payments by your company. Please contact Alex Falo at Celtic (tel: 310-664-4681; email: afalo@celticcapital.com) if you have any questions concerning this letter.

Very truly yours,

*J. Alexandra Rhim*

Levinson Arshonsky & Komsky, LLP

cc: Celtic Capital Corporation
Borrower

# EXHIBIT 1

| Inv Date | Due Date | Invoice | Invoice Amount | Current | > 30 | > 60 | > 90 | > 120 | Total | Days |
|---|---|---|---|---|---|---|---|---|---|---|
| **LEEENT - Lee Enterprises, Inc.** | | **Terms: Net 45** | **Account Manager: Thomas Warren** | | | | | | | |
| **Email: apbuffalo@bhmginc.com** | | | | | | | | | | |
| 6/2/26 | 7/17/26 | 25233 | 3,858.31 | 0.00 | 0.00 | 3,858.31 | 0.00 | 0.00 | 3,858.31 | -33 |
| 6/12/26 | 7/27/26 | 25273 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | -23 |
| 6/12/26 | 7/27/26 | 25279 | 5,567.14 | 0.00 | 0.00 | 5,567.14 | 0.00 | 0.00 | 5,567.14 | -23 |
| 6/17/26 | 8/1/26 | 25295 | 1,371.97 | 0.00 | 0.00 | 1,371.97 | 0.00 | 0.00 | 1,371.97 | -18 |
| 6/17/26 | 8/1/26 | 25316 | 4,706.10 | 0.00 | 0.00 | 4,706.10 | 0.00 | 0.00 | 4,706.10 | -18 |
| 6/19/26 | 8/3/26 | 25294 | 1,077.76 | 0.00 | 0.00 | 1,077.76 | 0.00 | 0.00 | 1,077.76 | -16 |
| 6/19/26 | 8/3/26 | 25298 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | 0.00 | 0.00 | 10,433.25 | -16 |
| 6/19/26 | 8/3/26 | 25307 | 7,934.96 | 0.00 | 0.00 | 7,934.96 | 0.00 | 0.00 | 7,934.96 | -16 |
| 6/19/26 | 8/3/26 | 25308 | 20,717.41 | 0.00 | 0.00 | 20,717.41 | 0.00 | 0.00 | 20,717.41 | -16 |
| 6/23/26 | 8/7/26 | 25319 | 1,483.42 | 0.00 | 1,483.42 | 0.00 | 0.00 | 0.00 | 1,483.42 | -12 |
| 6/23/26 | 8/7/26 | 25320 | 3,972.33 | 0.00 | 3,972.33 | 0.00 | 0.00 | 0.00 | 3,972.33 | -12 |
| 6/26/26 | 8/10/26 | 25321 | 25,863.36 | 0.00 | 25,863.36 | 0.00 | 0.00 | 0.00 | 25,863.36 | -9 |
| 6/26/26 | 8/10/26 | 25323 | 10,351.74 | 0.00 | 10,351.74 | 0.00 | 0.00 | 0.00 | 10,351.74 | -9 |
| 7/1/26 | 8/15/26 | 25346 | 1,371.97 | 0.00 | 1,371.97 | 0.00 | 0.00 | 0.00 | 1,371.97 | -4 |
| 7/10/26 | 8/24/26 | K25008 | 9,685.17 | 0.00 | 9,685.17 | 0.00 | 0.00 | 0.00 | 9,685.17 | 5 |
| 7/10/26 | 8/24/26 | T27001 | 23,494.86 | 0.00 | 23,494.86 | 0.00 | 0.00 | 0.00 | 23,494.86 | 5 |
| 7/10/26 | 8/24/26 | T27002 | 1,371.97 | 0.00 | 1,371.97 | 0.00 | 0.00 | 0.00 | 1,371.97 | 5 |
| 7/16/26 | 8/30/26 | T27006 | 21,932.46 | 0.00 | 21,932.46 | 0.00 | 0.00 | 0.00 | 21,932.46 | 11 |
| | | **Customer ID Sub-Total:** | **165,627.43** | **0.00** | **99,527.28** | **66,100.15** | **0.00** | **0.00** | **165,627.43** | |
| | | | | | **60 %** | **40 %** | | | | |

**EXHIBIT 2**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

---

In Re

BUFFALO NEWSPRESS INC. d/b/a
BNP EMPOWERED PRINT

Debtor

Case No. 25-10125-CLB

Chapter 11

---

**ORDER: (1) APPROVING STIPULATION RE RELIEF FROM AUTOMATIC STAY; AND (2) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(1) AND (d)(2)**

Celtic Capital Corporation ("Celtic") having filed a motion for entry of an order: (1) approving the stipulation for relief from the automatic stay entered into with the debtor (the "Stipulation"); and (2) granting relief from the automatic stay pursuant to 11 U.S.C. § 362 (the "Motion") which was heard on August 10, 2026 and no opposition was made thereto, it is hereby:

ORDERED, that the Motion is granted pursuant to 11 U.S.C. § 362(d)(1) and (d)(2);

FURTHER ORDERED that as to Celtic, its successors, transferees and assigns, the stay under 11 11 U.S.C. § 362(a) is terminated to permit Celtic to enforce its rights and remedies against the debtor's personal property assets (including but not limited to accounts receivable, equipment, inventory, related items and proceeds thereof) consisting of Celtic's collateral;

FURTHER ORDERED that the 14-day stay provided by FRBP 4001(a)(3) is waived; and

FURTHER ORDERED that this order is binding and effective despite a conversion to a case under any other chapter of the Bankruptcy Code.

Dated: Buffalo, New York

August 11, 2026

FILED
AUG 11 2026
BANKRUPTCY COURT
BUFFALO, NY

CARL L. BUCKI
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

---

In Re

BUFFALO NEWSPRESS INC. d/b/a
BNP EMPOWERED PRINT

Debtor

Case No. 25-10125-CLB

Chapter 11

---

**ORDER: (1) APPROVING STIPULATION RE RELIEF FROM AUTOMATIC STAY; AND (2) GRANTING RELIEF FROM THE AUTOMATIC STAY <u>UNDER 11 U.S.C. § 362(d)(1) AND (d)(2)</u>**

Celtic Capital Corporation ("Celtic") having filed a motion for entry of an order: (1) approving the stipulation for relief from the automatic stay entered into with the debtor (the "Stipulation"); and (2) granting relief from the automatic stay pursuant to 11 U.S.C. § 362 (the "Motion") which was heard on August 10, 2026 and no opposition was made thereto, it is hereby:

ORDERED, that the Motion is granted pursuant to 11 U.S.C. § 362(d)(1) and (d)(2);

FURTHER ORDERED that as to Celtic, its successors, transferees and assigns, the stay under 11 11 U.S.C. § 362(a) is terminated to permit Celtic to enforce its rights and remedies against the debtor's personal property assets (including but not limited to accounts receivable, equipment, inventory, related items and proceeds thereof) consisting of Celtic's collateral;

FURTHER ORDERED that the 14-day stay provided by FRBP 4001(a)(3) is waived; and

FURTHER ORDERED that this order is binding and effective despite a conversion to a case under any other chapter of the Bankruptcy Code.

Dated: Buffalo, New York

August 11, 2026

CARL L. BUCKI
UNITED STATES BANKRUPTCY JUDGE

FILED
AUG 11 2026
BANKRUPTCY COURT
BUFFALO, NY

Case 1-25-10125-CLB, Doc 287, Filed 08/11/26, Entered 08/11/26 10:21:10, Description: Main Document , Page 1 of 1

| | |
|---|---|
| **From:** | Astrid Garcia |
| **To:** | J. Alexandra Rhim |
| **Cc:** | Joshua Rinehults |
| **Subject:** | Re: Buffalo Newspress: Demand for Payment |
| **Date:** | Tuesday, September 15, 2026 6:18:57 AM |
| **Attachments:** | image001.png |

Thanks for forwarding.  We will be in touch shortly.

Astrid Garcia
Chief Legal Officer
VP HR and Legal
Lee Enterprises
215-284-2351

**From:** J. Alexandra Rhim <arhim@laklawyers.com>
**Sent:** Monday, September 14, 2026 6:02 PM
**To:** Joshua Rinehults <josh.rinehults@lee.net>; Astrid Garcia <astrid.garcia@lee.net>
**Subject:** FW: Buffalo Newspress: Demand for Payment

Mr. Rinehults and Ms. Garcia –

I am outside counsel for Celtic Capital Corporation, a creditor that is owed amounts from Lee Enterprises.

I am forwarding this correspondence to you as I am not certain whether it was received by Mr. Poulos.

I look forward to hearing back from you.

Regards,
Alex

J. Alexandra Rhim
**Levinson Arshonsky & Komsky, LLP**
Direct Dial: (818) 817-2434
arhim@laklawyers.com

**From:** J. Alexandra Rhim
**Sent:** Thursday, September 10, 2026 5:51 PM
**To:** 'steve.poulos@lee.net' <steve.poulos@lee.net>
**Subject:** Buffalo Newspress: Demand for Payment
**Importance:** High

Mr. Poulos –

I am following up on the attached demand letter that was sent to your attention on August 19, 2026. We have not received any response or communication.

As explained in the letter, the unpaid amount of $165,627.43 is owed by your company to Celtic Capital Corporation ("Celtic"). Attached is the court order authorizing payment be made to Celtic.

Please immediately contact Alex Falo to make arrangements for payment. He can be reached at tel: 310-664-4681 or email: afalo@celticcapital.com.

Your immediate attention is required as this will be our last informal demand for payment. If payment is not received by September 17, 2026, we will commence a lawsuit against your company and also seek prejudgment interest and legal fees to the extent recoverable by applicable law. Thank you.

Alex

J. Alexandra Rhim, Partner
**Levinson Arshonsky & Komsky, LLP**
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Direct Dial: (818) 817-2434
Facsimile: (818) 382-3433
arhim@laklawyers.com

LA&K
Levinson Arshonsky & Komsky, LLP

Please consider the environment before printing my email

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmission is intended only for use of the individual or entity named above. This e-mail transmission, and any documents, files, previous e-mail transmissions or other information attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient of this e-mail transmission, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, copying or other use of this transmission or any of the information contained in or attached to it is strictly prohibited. If you have received this e-mail transmission in error, please immediately notify us by return e-mail transmission or by telephone at (818) 382-3434, and destroy the original e-mail transmission and its attachments without reading or saving it in any manner. Thank you.